## In re SERVICE RENDERED BY FLORIDA TELEPHONE CORPORATION.
Docket No. 71138-TP. Order No. 5314.
Florida Public Service Commission.
February 2, 1972.

J. Thomas Gurney, Sr. and J. Thomas Gurney, Jr., both of Orlando, for Florida Telephone Corporation.

Leo L. Foster, special attorney for the commission.

Prentice P. Pruitt, chief staff counsel and director of the legal department, for the public generally.

Chairman JESS YARBOROUGH, Commissioners WILLIAM T. MAYO and WILLIAM H. BEVIS, participated in the disposition of this matter.

BY THE COMMISSION.

Pursuant to notice, the commission held public hearings in this matter on August 30, 1971, at Ocala; August 31, 1971, at Inverness; September 2, 1971, at Kissimmee; September 3, 1971, at Dade City; and December 7, 1971, at Leesburg. The commission, after having fully considered the entire record herein, now enters its order in this cause.

This investigation was initiated by the commission on its motion as a result of its continuing surveillance program of the various utilities operating within the state of Florida under commission regulation. An additional factor which led to this investigation stemmed from the fact that during portions of 1969, and from time to time throughout 1970, numerous complaints were registered with this commission with respect to both the quality and quantity of service being rendered by the Florida Telephone Corporation in many sections of its certificated area. In fact, for the twelve-month period ended June 30, 1970 and 1971 the number of complaints received by the commission from the service area of this company was the third highest in the state and when equated to the relative number of main stations and trunks served, ranked at or near the top in this regard among the six largest regulated telephone utilities.

Through commission staff intervention and attendant actions by the company many of the experienced problems brought to our attention during this period were eliminated or satisfactorily resolved. However, the continued indication of public dissatisfaction evidenced by a sustained high level of complaints together with independent investigations and service evaluations conducted by its staff led the commission, on its own motion, to issue its order no. 5152 in this docket, dated June 29, 1971, instituting an investigation into the quality and adequacy of service being rendered by the Florida Telephone Corporation throughout its service area.

In that order the commission established a schedule of public hearings which were subsequently held during late August and early September, 1971, at selected locations throughout the service area of the company thereby affording all interested parties a convenient opportunity to be fully heard on the issues involved in this case.

Prior to the time of these public hearings members of the commission's engineering staff conducted a comprehensive and independent investigation of the quality of service being rendered at that time. That investigation, which required a period of several weeks, included visits to each exchange and every central office in

the company and consisted of tests and inspections made to evaluate a variety of service items such as dial tone speeds, call completions (local intra and inter-office, EAS and DDD toll intra and inter-company calls), answering times for toll, directory assistance, intercept, repair and business office services, directory assistance service, availability and adequacy of intercept service, public pay station services, adequacy of emergency stand-by power facilities and the standardization of signalling tones to the subscriber. A copy of the staff report dated May 25, 1971, the findings and conclusions reached therein and the company response thereto, has been introduced in evidence and made a part of the record in this case. Reference to appropriate parts of that report will be made later in this order.

This commission has long recognized the importance of adequate and efficient public utility services to the continually expanding economy of this state. In 1967 the Florida legislature, in response to proposed legislation suggested and actively supported by a current member of this commission, enacted the so-called "Rates and Service" Law( §366.041, Florida Statutes). To complement the law the commission subsequently adopted comprehensive uniform standards for telephone service and prescribed administrative rules requiring periodic reports which, together with field inspections, serve to keep it fully advised with respect to the quality and sufficiency of telephone service being provided throughout the state of Florida. This 1967 law, the validity of which has been upheld by the Supreme Court of Florida, authorizes the commission to give meaningful consideration to the adequacy and quality of service when fixing public utility rates and has been invoked on a number of occasions in the public interest.

From the record it appears that at some time during the period under review, company management came to a recognition, however belatedly, of the commission's firm determination to require reasonable compliance with prescribed standards of service as well as its stated intention to make such use of the "Rates and Service" Law as may be justified by the facts in any particular case. Evidence of this enlightened management approach is indicated by a sharp acceleration of the company's construction and installation program, the effects of which have resulted in substantial improvements in certain measurable service categories.

The commission has made, as a result of investigation and the various hearings held herein, an itemized analysis of the quality of service rendered by the company as related to prescribed standards of service and as indicated by the periodic reports filed in compliance with our directive. To observe both the timing and

the trends of changes which have occurred in the several service categories, we include comparative data on experienced results obtained both before and after the twelve months ended June 30, 1971, as follows —

### *Held applications — new service*

Held applications for new service over thirty days old which during 1969 varied from a low of 277 to a high of 363 increased during calendar 1970 to corresponding levels of 399 to 569. Excluding the Southern Bell system results for the first two calendar quarters, the level of unsatisfied requests for new service aged over thirty days experienced by the Florida Telephone Corporation during 1970 were, on average, the highest in the state. However, substantial improvements in this category have been realized since that time. During the first three calendar quarters of 1971, the company worked a total of 14,359 requests for new service resulting in successive reductions in quarter-ending totals for such applications to 419 — 245 and 87, respectively. As of September 30, 1971, there were a total of 20 requests for new service over six months old, all outside the base rate area and all but three scheduled for service by the end of the year; and by November 30, 1971, all held applications for new service within the base rate area had been eliminated throughout the system. We therefore find that the results achieved during the period demonstrate satisfactory progress in this category and that the current levels of such held applications are within acceptable limits for this company.

### *Held applications — regrades*

The range of held regrade applications over thirty days old was high during 1969 when it varied between 2665 and 3721 and increased to even higher levels during 1970 when the corresponding figures were 4058 and 5095, respectively. In addition, an equally disturbing statistic was the number of such unsatisfied requests located within the base rate areas which, during this period, varied between 1074 and 1289. These 1970 results were, on average, the second highest in the state in both categories during this period. Starting with the fourth quarter of 1970, however, the prior upward trends were reversed and the subsequent reductions realized, although less spectacular than those in the new service category, have since been trended in the proper direction. During the first three calendar quarters of 1971 the company worked a total of 6536 regrade orders resulting in successive reductions in quarter-ending totals for such applications to 3813 — 3496 and 2863, respectively. Correspondingly, the end-of-quarter levels for unsatisfied requests for the preferred grades of service within the base rate areas were reduced from the previously indicated 1970 highs to 739 — 569

and 407, respectively. While the progress demonstrated by these 1971 results is encouraging, the need for further reductions to more respectable levels is obviously indicated. At the December 7th hearing in Leesburg, witness Locke, in projecting future activity in this category, testified that cable projects then underway should serve to satisfy approximately 1000 held regrades by January 1, 1972, and another 540 during the first quarter of 1972 and further, by January 1, 1972, they did not anticipate having any held regrade requests within any base rate area company-wide (Tr. 71). At that same hearing, witness Wettstein, in testifying on the held order situation, stated that by the end of 1972 and thereafter the company expected to be able to meet requests for service on a current basis. Accordingly, we will continue our surveillance of this item to insure that these commitments are met and that the experienced volumes are reduced to, and maintained at, more acceptable levels.

### Installation intervals

Since the standard for service installations was established at the end of 1968, the results achieved by this company have shown steady progress toward full compliance. During 1969 the reported results indicate that the company failed to meet standard 38 times out of a total of 247 readings which equates to a failure rate of 15.39%. This record was improved upon substantially during 1970 when there were a total of 9 recorded failures to meet standard out of a total of 256 readings, equating to a failure rate of only 3.51%. Results for the first six months of 1971 demonstrate full compliance with standard and testimony given at the September hearings indicate that this perfect record was maintained through August of 1971. Reports for the last half of 1971 are now due and will be filed within the next week or two. If the record for the first eight months is maintained, or approximated, over this latter period the company efforts will be judged satisfactory, and we fully expect and require that this be done.

### Repair service

The company record in meeting this standard prior to 1971 left something to be desired. Operating results for repair service during 1969 were some 20.33% below standard for restoration of service with a system-wide trouble index of 10.92. The 1970 results were not materially different with an indicated failure rate of 19.14% for restoration of service accompanied by an increase in the system trouble index to 12.76. The results for the first half of 1971 demonstrate for the first time, at least in part, acceptable levels of performance. Operating records over this period indicate full compliance with the commission requirement for restoration of

service throughout the system although the system trouble index increased further to a level of 13.6. While the results for restoration of service appear to have reached satisfactory levels, the trouble index continues at the highest level in the state among the six largest telephone companies, indicating an obvious need for improvement. Based on the testimony given at the Leesburg hearing, as well as projections made in late-filed exhibit no. 27, the company anticipates reductions from experienced levels of performance, and we will continue surveillance of this item and future trends will be observed and evaluated.

## Traffic

The general heading of traffic covers the three sub-elements of (a) Dial Tone Speed, (b) Call Completion, and (c) Trunking.

(a) *Dial Tone Speeds.* Heretofore, dial tone speed measurements have been taken manually on a sampling basis. While the commission staff's service evaluation report introduced as exhibit no. 2 found no noticeable delays in receiving dial tone, it was recommended therein that dial tone delay recording equipment be installed or made available at each central office on the premise that the use of such equipment is superior to the methods used in the past and will produce more accurate and reliable data for future determinations. The company response indicated that three permanent and two portable units had been ordered and were scheduled for delivery during the fourth quarter of 1971. It was also indicated in the response that additional installations of permanent units were scheduled for some eight other central offices during 1972. We hereby require a response from the company indicating the current status of this program and we further order the filing by the company of status reports on a quarterly basis until the overall program has been completed.

(b) *Call Completions.* Although the results obtained by the staff through a manual sampling of calls indicated call completion percentages within prescribed limits for intra-office calls, it was suggested that the company provide information on their overall plan for measuring and determining call completion percentages for all traffic. Again, as with the previous category, we believe that automated procedures would produce more reliable and meaningful data than the manual dialing methods heretofore used. The company response stated that its traffic department was investigating equipment to automatically obtain call completion results but that, up to that time, no satisfactory device had been found. We hereby require the filing of a further report setting forth the current situation in this regard.

(c) *Trunking.* The general term "trunking" embraces three separate categories, viz., inter-office, EAS and toll connecting trunks. Traffic studies provided at quarterly intervals over the twelve months ended June 30, 1971, indicated, at various times, deficiencies in all three categories. However, with trunking additions being installed on a continuing basis many of these indicated shortages were relieved during this period so that, at the time of the initial series of hearings in late August and early September, 1971, the extent of trunking deficiencies disclosed by the transcript of record was as follows — a shortage of 16 trunks in 8 groups out of a total of 99 toll connecting trunk groups; a deficiency of 1 trunk in 1 of a total of 51 EAS trunk groups; and a shortage of 5 trunks in 2 of a total of 21 inter-office trunk groups. In summary, out of a total of 171 groups which include 2308 total trunks there was a shortage of 22 circuits in 11 separate groups. At the initial hearing in Ocala, witness Locke testified that these existing deficiencies would be eliminated in all groups by the end of December, 1971. Since commission rules require that traffic studies be taken during the busy season and since the busy season occurs at different times in the various exchanges served by the company it would require a period of several months before the staff could evaluate compliance with the above commitment through the normal review of quarterly report filings. We therefore require and order that the company file a responsive statement herein indicating the degree of compliance with its commitment to eliminate all existing trunking deficiencies by the end of December, 1971, as soon as the information required is available.

## Answering times

Answering time results embrace three different categories, namely, toll, directory assistance and intercept, and repair service. Repair service answering times have met prescribed standards in all instances since the rule was established. During 1969 toll operator answering times were 25% below standard and the results for directory assistance and intercept were deficient by 2.78%. In 1970 prescribed levels were attained except that results for toll answering was below standard during the first calendar quarter. Since April, 1970, and through the third calendar quarter of 1971, prescribed standards have been met in all instances in all categories. Company progress in this area is found to be satisfactory.

## Class of service ratios

One of the commission rules promulgated in December, 1968, established for all telephone companies an objective which provided that within five years from such effective date the maximum number of subscribers served under the minimum grade of line

offered should not exceed five main stations per circuit. Within the past two years the company has established three new exchanges and converted three sub-exchanges to main exchanges, all on the basis of 1 and 2 party service within the base rate area and all of which, by the end of the current calendar quarter, will be meeting the requirement for a maximum of five parties on multi-party lines, making a total of seven exchanges where eight party service will have been eliminated. During the twelve months ended June 30, 1971, the one and two party ratio increased some 4.7% and as of June 30, 1971, nearly 50% of all existing multi-party customers were being served on lines designated for a maximum of five parties. Also, as of June 30, 1971, and excluding the six exchanges to which reference was made above there were five additional exchanges where the ratios of customers served on eight party lines were some 7% or less. During the hearings testimony was given on at least two occasions that the company expects to be in full compliance with this rule within the time frame provided therein, and the same is hereby required.

### Programs for improvement

During the initial series of hearings, witness Locke testified in some detail to a variety of construction programs and projects either recently completed, then underway, or planned, to bring about improvements in both quality and quantity of service. These projects are identified and enumerated in company exhibit nos. 8, 12, 17, 20 and 22. At the final hearing in Leesburg, the staff requested and the company subsequently filed exhibit no. 26 setting forth the then-current status of the many projects summarized in the previous exhibits. A review of this late-filed exhibit no. 26 discloses that there were a number of these projects either still in process or in the planning stages at year end. In view of this we hereby require a further report covering those items which had not been completed at the end of 1971, giving the current status at the time of its filing and thereafter the filing of continuing status reports at calendar quarter intervals until each program has been completed or until the further direction of the commission.

Not included in the above summaries but testified to at the Leesburg hearing are a number of other projects likewise having as their objective improvements in the quality and quantity of service in certain specified areas. Due to the necessity for continuing surveillance and the need for this commission to have at its disposal current information on the quality of service being rendered, we now require continuing status reports be filed by the company at calendar quarter intervals until each project has been completed or until the further direction of the commission.

The specific additional projects referred to are as follows —

(a) The establishment of a new main exchange in the Astor-Astor Park area tentatively scheduled for an in-service date of late 1972.

(b) For the facility additions planned to provide improved service in the Paisley, Lake Mack areas served out of the Umatilla exchange and the Cassia, Pine Lake rural areas served out of the Eustis exchange, both of which have estimated in-service dates of July, 1972, we shall require an initial report providing more detailed information on each of these projects and thereafter the quarterly status reports specified.

(c) Progress reports on the installation of additional cable facilities between Apopka and Zellwood scheduled for July or August of this year as per testimony on page 93 of the transcript.

(d) Conversion of the San Antonio sub-exchange to a new main exchange with a tentative cutover date early in the fourth quarter of 1972.

(e) Conversion of the Trilicoochee sub-exchange office to a new main exchange tentatively scheduled for a fourth quarter 1972 cutover.

(f) Progress reports on the installation of additional outside plant facilities in Ocala, Umatilla, Apopka, Eustis, Winter Garden, Dade City and St. Cloud exchange areas which were not included in exhibit nos. 8, 12, 17, 20 and 22 (excluding items b and c above) but are being added to provide more reliable service and/or plant margins on a catch-up basis or to stay on a current basis.

## Complaints

As previously indicated herein the number of service complaints reaching the commission from the service area of this company over recent periods ranks high among the telephone companies in the state. For the last three years the actual numbers recorded are 145, 184 and 129, respectively. These high levels of customer dissatisfaction were reflected in the fact that some 124 subscribers appeared and gave evidence on service problems during the initial series of hearings. The appearances at the individual hearings were Ocala — 15, Inverness — 2, Tavares — 41, Kissimmee — 32, and Dade City — 34. While the testimony covered the gamut of service difficulties, those which occurred with the greatest frequency or which were prevalent over a general area were lack of facilities for new and up-graded services, lack of adequate facilities, service interruptions and transmission problems in East Lake County rural areas and the Keenansville — Deer Park areas of Osceola

County, and DDD and local dialing problems in the San Antonio — Trilicoochee areas. As required by the commission each complaint has been investigated by the company, a personal contact made and a report submitted to the commission and, in addition, nearly all of those who appeared have had a follow-up contact by a commission representative. In the vast majority of cases improvement has been reported and appreciation has been expressed for the commission's continuing interest. It is our finding that the programs previously discussed and now underway will do much to alleviate remaining deficiencies. The few witnesses who have indicated continuing difficulties and the need for further corrective action may be assured that we will continue to investigate, on an individual basis, their service problems and require reasonably adequate telephone service for them.

It is therefore ordered that Florida Telephone Corporation is hereby censured for its failure to move more promptly to effect compliance with service standards of this commission established in 1968 because a comparative analysis of operating results over the three year period clearly shows that, with some few exceptions, little real progress was demonstrated in the measureable service categories until 1971.

It is further ordered that continued surveillance be maintained by the commission's staff to insure improved performance at more acceptable levels, as indicated in the body of this order.

It is further ordered that the company shall file within sixty days a response to this order and, thereafter, quarterly status reports on the progress being realized for those projects and programs underway or planned to bring about further necessary improvements in overall quality and quantity of service, as outlined in the body of this order.

It is further ordered that this docket remain open for the purpose of further review and evaluation of the progress made and performance levels attained for the balance of the current year, and we do expect and hereby require the company to meet the several commitments made during the course of these hearings to the people in all of its service area and to this commission that, by the end of this year (1972) it will not only be providing quality service on a current basis and, of equal importance, be prepared to maintain those performance levels on a continuing basis. In the event further hearings are required herein, such hearings shall include, but not be limited to, investigation for the purpose of ascertaining whether or not the respondent, Florida Telephone Corporation, has the ability and facilities reasonably required to render adequate service in all of its present service areas.