652 P.2d 1200

**In the Matter of the Application of GENERAL TELEPHONE COMPANY OF the SOUTHWEST for an Adjustment in Rates and Charges for Intrastate Telephone Service Furnished by it within the State of New Mexico.**

**GENERAL TELEPHONE COMPANY OF The SOUTHWEST, Appellant,**

v.

**CORPORATION COMMISSION, Appellee,**

**and**

**Lea County, et al., Intervenors.**

**No. 13726.**

Supreme Court of New Mexico.

Sept. 15, 1982.

Rehearing Denied Oct. 20, 1982.

Bigbee, Stephenson, Carpenter, Crout & Olmsted, Charles D. Olmsted, William P. Templeman, Lindsay A. Lovejoy, Jr., Santa Fe, Ward W. Wueste, Jr., William G. Mundy, San Angelo, Tex., for appellant.

Pat Ortiz, Gen. Counsel, State Corp. Com'n, Jeff Bingaman, Atty. Gen., Paul L. Biderman, Asst. Atty. Gen., Santa Fe, for Corp. Com'n.

R.E. Richards, Lawrence D. Hanna, Hobbs, for intervenors.

## OPINION

FEDERICI, Justice.

In 1980, General Telephone of the Southwest (GTSW), filed an application with the New Mexico State Corporation Commission

(SCC) requesting that tariff charges proposed by GTSW become effective December 31, 1980. The proposed changes in the tariffs were to produce additional intrastate revenues of $2,280,201.00. The SCC suspended the proposed changes pending investigation and hearings pursuant to N.M. Const., Art. XI, §§ 7 and 8. Before any hearings were held, the SCC informally advised GTSW that it had arrived at a revenue deficiency of $694,545.00. The parties stipulated to a rate design allocating the $694,545.00 deficiency, with GTSW reserving the right to contest the deficiency proposed by the SCC.

The SCC approved the intervention of the Lea County Board of County Commissioners, the City of Hobbs, the City of Lovington, the City of Eunice and the City of Jal (Intervenors). The Intervenors sought to produce evidence that the quality of service provided by GTSW in the areas represented by the Intervenors was inadequate.

Hearings were conducted in April and May of 1981, and GTSW and the SCC each presented expert witnesses who testified as to GTSW's revenue requirements. The Intervenors presented evidence of quality of service through customers of GTSW and through an expert witness.

The SCC entered its final order on June 1, 1981, concluding that the rates proposed by GTSW were unreasonable and that such rates should only be increased by $694,-545.00. GTSW filed its petition for an order of removal to this Court, which petition was granted. The cause was submitted to this Court in final form in February 1982.

In these removal proceedings, GTSW presents the following points:

1. The SCC's use of "estimated" separation factors to arrive at GTSW's rate base and expenses was arbitrary and capricious and contravenes the mandate of N.M.Const., Art. XI, § 7, that "due consideration shall be given to the * * * investment and expenditure as a whole within the State."

2. The SCC's determination of GTSW's cash working capital was arbitrary and capricious and radically departs from past practice without reasonable justification in the record.

3. The SCC's determination of GTSW's net operating income by trending both local and intrastate toll service revenues was arbitrary, capricious and not supported by credible evidence.

4. The SCC erred in its determination of GTSW's federal income tax expense through the use of the "double leverage" theory.

5. The SCC's application of the "double leverage" theory to determine the appropriate rate of return on the value of GTSW's invested capital resulted in rates which are unreasonably low and confiscatory, thereby denying GTSW due process of law prescribed by the Fourteenth Amendment to the Constitution of the United States and N.M.Const., Art. II, § 20.

6. The SCC's application of the "double leverage" theory to determine GTSW's appropriate rate of return on the value of its invested capital in New Mexico denied GTSW the equal protection of the laws under the Fourteenth Amendment.

7. The SCC's application of the "double leverage" theory to determine a reasonable rate of return, and the corresponding adjustment to fixed charges (interest) taken as a deduction in calculating federal income tax for ratemaking purposes, was not supported by the record and was, in fact, contrary to the evidence.

8. The SCC arbitrarily refused to recognize over $2 billion in GTE common equity in its application of the double leverage theory.

9. The rate of return granted by the SCC was so low as to result in confiscation of GTSW's property in violation of the Fourteenth Amendment to the Constitution of the United States and N.M. Const., Art. II, § 20 and was wholly contrary to the evidence.

10. The SCC improperly considered the "expert testimony" of its staff witness in arriving at a rate of return for GTSW.

11. The SCC had no authority to penalize a utility for reasons relating to quality

of service in a ratemaking proceeding and, in any event, in purporting to do so the SCC violated GTSW's right to due process of law.

The SCC rejected GTSW's toll-leveling adjustment which resulted in a mismatch of test period revenues, investment and expenses, by utilizing end-of-period investment and expenses with average period return. The SCC adopted an adjustment designed to provide a proper matching for test period purposes.

The SCC rejected the separation ratios recommended by GTSW since those ratios distorted test period operations by reflecting only the average relationship between interstate and intrastate operations during the test period. The SCC accepted a methodology which annualized separation ratios for purposes of the test period.

The SCC rejected GTSW's federal income tax calculation in favor of a calculation derived by utilizing GTSW's double leverage capital structure and cost of debt at December 31, 1980, so as to be more reflective of the actual taxes required to be paid by GTSW.

The SCC rejected GTSW's proposed cash working capital allowance derived by means of the arbitrary formula approach. The SCC accepted a cash working capital allowance based upon a methodology that gives more recognition to the existence of time lags which work in favor of the company as well as those which work against it, and thus is more reflective of the actual cash working capital requirements of GTSW.

The SCC considered the evidence regarding cost of common equity capital and determined from that evidence that the zone of reasonableness for a fair rate of return on common equity lay between 13.8% and 16%. In determining the actual point within the zone at which rates should be set, the SCC indicated that the inadequate service being rendered by GTSW required a return at the low end of the zone, i.e., 13.8%. However, the SCC provided an incentive to GTSW to improve service by indicating that a higher return within the zone is proper when adequate service is being provided.

The SCC rejected any adjustment to the return on equity for market pressure, market break, and flotation costs, since the record indicated that such an adjustment would provide excessive revenues to GTSW and that GTSW would incur no costs for which the adjustment was intended to compensate.

The SCC rejected use of GTSW's booked capital structure and instead opted for a double leveraged capital structure in order that the ultimate stockholders of GTSW, i.e., the investors in the marketplace, would earn no more on their equity investment in GTSW than the market cost of equity. The SCC determined that such a capital structure was necessary to prevent discrimination against companies which do not engage in double leveraging as well as to prevent excessive returns at the expense of ratepayers.

The SCC determined that the weighted cost of capital method which it employed to determine the fair rate of return indicated a fair rate of return on rate base for GTSW to be 11.5%. The SCC determined that such a return was sufficient to assure confidence in the financial integrity of GTSW, so as to maintain its credit and to attract capital and was commensurate with returns on investments in other enterprises having corresponding risk. The SCC further indicated that such a return would generate enough actual dollars so that both stockholders and ratepayers were fairly treated.

The SCC then discussed the poor quality of service being provided by GTSW which constrained the SCC to grant a return of 11.5%, the low end of the zone of reasonableness, rather than a return of 11.91%, which the SCC determined would have been appropriate in the absence of service inadequacies.

We have weighed the evidence as it appears in the record, and it is our considered and independent conclusion that the results expressed in SCC findings and conclusions on Point 1 and Points 3 through 10 are correct and we adopt them as our own. We do not agree with the results reached by the SCC on Points 2 and 11. We will also

discuss in some detail Point 5 (double leverage), even though we reach the same result as did the SCC.

### I. Scope of Review.

■ The scope of review of this Court's constitutional powers and duties in removal proceedings from the SCC is indeed unique.

N.M.Const., Art. XI, § 7, provides that upon removal by a party of an SCC proceeding to the Supreme Court, the Supreme Court may require or authorize additional evidence. No similar privilege is granted to the SCC. In fact, this same constitutional provision states that upon removal of proceedings to the Supreme Court by the SCC, "no additional evidence shall be allowed."

Up to this point, the Court's duty is not defined. However, the last sentence of N.M.Const., Art. XI, § 7, reads:

In addition to the other powers vested in the supreme court by this constitution and the laws of the state, the said court shall have the power and *it shall be its duty to decide such cases on their merits,* and carry into effect its judgments, orders and decrees made in such cases, by fine, forfeiture, mandamus, injunction and contempt or other appropriate proceedings. (Emphasis added.)

The above language in our Constitution changes the rule generally applied that an appellate court will only *review* the evidence and not *weigh* it. *See Duke City Lumber Company, Inc. v. Terrel,* 88 N.M. 299, 540 P.2d 229 (1975). This Court has interpreted the scope of review as mandated by the above constitutional provision in two recent cases: *Mountain States Tel. v. New Mexico State Corp.,* 90 N.M. 325, 563 P.2d 588 (1977) and *Matter of Missouri Pac. R. Co.,* 93 N.M. 753, 605 P.2d 1152 (1980).

In *Matter of Missouri Pac. R. Co., supra,* we held that, notwithstanding that we weigh the evidence rather than review it, we are not a ratemaking body, and do not have the power or authority to determine what a fair rate of return shall be. After weighing the evidence, this Court determines whether an order of the Commission is just and reasonable. This determination is made based upon the evidence adduced at

the hearing before the SCC. *See also Mountain States Tel. v. New Mexico State Corp., supra; State Corporation Com'n v. Mountain States Tel. & Tel. Co.,* 58 N.M. 260, 270 P.2d 685 (1954); *Seward v. D. & R.G.,* 17 N.M. 557, 131 P. 980 (1913).

In *Matter of Missouri Pac. R. Co., supra,* we held that:

Given this constitutional mandate, our review is not one of the substantiality of the evidence presented to the commission, but rather, *involves a weighing of such evidence and arriving at a result in accordance with a preponderance thereof.* (Emphasis added.)

*Id.* 93 N.M. at 754, 605 P.2d at 1153 (1980).

Consistent with the above case law, we confirm the rule applicable in removal cases to be that under N.M. Const., Art. XI, § 7, this Court is not a ratemaking body and has no authority to determine what is a fair rate, but this Court will *weigh* the evidence to arrive at an independent determination as to whether the order entered by the SCC is just and reasonable and if not, then remand to the SCC for further proceedings not inconsistent with our independent determination.

### II. General-Ratemaking process.

■ Certain principles of law governing the authority and duty of the SCC in the ratemaking process are worthy of reiteration. By constitutional fiat, the SCC is granted clear and all-inclusive power to regulate certain businesses and to protect the public interest by establishing reasonable rates for consumers. Of equal dignity is the established principle of law that the failure of the SCC to provide rates that will give the company a reasonable rate of return constitutes a violation of due process and a taking of property without just compensation. *Mountain States Tel. v. New Mexico State Corp., supra.* Further, if the proceedings for a rate increase will be unreasonably delayed and the company will suffer irreparable loss, the SCC should bear in mind the granting of some form of interim rate; failure on the part of the SCC to do so could amount to an unconstitutional

confiscation of property without compensation or without due process. *Id.*

### III. *Double Leveraged Capital Structure Method.*

■ Before proceeding with a discussion of the propriety of double leveraging, it would be useful to explain what double leveraging is and what it accomplishes, since the use of double leveraging in this case is one of first impression in New Mexico. "Leveraging" is a financial term used to describe the situation in which a corporation is funded by debt in addition to the equity supplied by stockholders. A corporation is said to be "leveraged" to the extent that debt is included in its capital structure. *Ark. Public Serv. v. Lincoln-Desha Tel. Co.,* 271 Ark. 346, 609 S.W.2d 20, 22 (1980); *New England Tel. & Tel. Co. v. Public Utilities Com'n.,* 148 Me. 374, 94 A.2d 801 (1953). Further, leverage is the term used to describe "the advantage gained by junior interests through the rental of capital at a rate lower than the rate of return which they receive in the use of that borrowed capital." *S.E.C. v. Central-Illinois Corp.,* 338 U.S. 96, 150, 69 S.Ct. 1377, 1405, 93 L.Ed. 1836 (1949); *New England Tel. & Tel. Co. v. Public Utilities,* Me., 390 A.2d 8, 40 (1978); *accord, Ark. Public Serv. v. Lincoln-Desha Tel. Co., supra,* 609 S.W.2d at 22; *Bristol Cty. Water Co. v. Harsch,* R.I., 386 A.2d 1103, 1110 (1978). By leveraging their investment with debt, stockholders may effectively "own" a corporation which is worth more than their original investment. *New England Tel. & Tel. Co. v. Public Utilities, supra,* 390 A.2d at 40. "Thus, we see that by use of leverage [it becomes possible for] the equity owners * * * to earn an over all rate of return in excess of the cost capital. The added earnings above the costs inure to the benefit of the stockholders as they then receive a higher rate of return than if the institution had been financed entirely by equity." *Ark. Public Serv. v. Lincoln-Desha Tel. Co., supra,* 609 S.W.2d at 22. Regulatory bodies prevent such an excess earnings by analyzing a utility's capital structure and allocating a different weighted cost to each of the individual elements of the capital structure, in-

cluding debt, so that the utility owners are allowed to earn on the debt only what it costs them to secure the leverage. *New England Tel. & Tel. Co. v. Public Utilities, supra,* 390 A.2d at 41. This is proper since a properly regulated utility should be allowed to recover only its true costs.

■■ Double leverage is an extension of the concept of leverage to a parent-subsidiary corporate relationship. The principle behind the double leverage adjustment is to account for the parent's accessibility to lower cost debt to purchase equity in its subsidiary, upon which it may earn a higher rate of return than it pays for the debt. *New England Tel. & Tel. Co. v. Public Utilities, supra,* 390 A.2d at 41. It recognizes that the relevant focal point for determining the cost of capital is that point where the corporate entity raises capital in the marketplace. *Bristol Cty. Water Co. v. Harsch, supra,* 386 A.2d at 1109. In restricting the actual shareholders, (the parent's stockholders) to the market cost of equity, it also prevents discrimination against companies that do not engage in double leveraging. *Re Hawkeye State Teleph. Co.,* 2 Pub. Util. Rep. (PUR) 4th 166, 180–81 (Ia. S.C.C.1973). Thus, if the cost of capital to the utility is considered without regard to the double leverage enjoyed in a parent-subsidiary relationship, an excessive return to the ultimate common stockholders could result at the expense of utility ratepayers. *Mountain States etc. v. Dept. of Pub. Serv.,* Mont., 624 P.2d 481, 483 (1981).

Thus, it appears that recognition of the effects of double leveraging is proper in order to determine the true cost of capital to the utility in a parent-subsidiary relationship. It has been accepted in a variety of states as a proper method of ratemaking purposes. *General Tel. Co. v. Ark. Public Service Com'n,* 272 Ark. 440, 616 S.W.2d 1 (1981); *Ark. Public Serv. v. Lincoln-Desha Tel. Co., supra; Southwestern Bell Tel. v. Ark. Public Serv.,* 267 Ark. 550, 593 S.W.2d 434, 444–445 (1980); *Gen. Tel., etc. v. Iowa State Commerce Com'n.,* 275 N.W.2d 364 (Iowa 1979); *United Tel. Co. of Iowa v. Iowa State Com.,* 257 N.W.2d 466 (Iowa

1977); *Mountain States etc. v. Dept. of Pub. Serv., supra; Bristol Cty. Water Co. v. Harsch, supra.* In fact, double leveraging has been applied to GTSW specifically, not only in New Mexico, but also in Arkansas and Texas. *General Tel. Co. v. Ark. Public Service Com'n., supra; Re General Teleph. Co. of the Southwest*, 39 Pub. Util. Rep. (PUR) 4th 483 (Tx.P.U.C.1980).

■ Double leveraging is not mandatory, but double leveraging is proper for use by the SCC in appropriate circumstances.

■ The SCC rejected use of GTSW's booked capital structure and instead opted for a double leveraged capital structure in order that the ultimate stockholders of GTSW, i.e., the investors in the marketplace, would earn no more on their equity investment in GTSW than the market cost of equity. The SCC determined that such a capital structure was necessary to prevent discrimination against companies which do not engage in double leveraging as well as to prevent excessive returns at the expense of ratepayers. We agree with the SCC that this method of double leverage is permissible and properly applied in this case.

■ We do not agree with the SCC's broad statement in its brief under Point 1, that it is not bound by any particular method in determining rates. The SCC is bound by, and limited to, its existing rules and regulations, proper application of the law, compliance with the constitutional mandate, and by previously established methods of ratemaking, absent a change in circumstances peculiar to the company and the pending case, making it necessary that there be a departure from established methods.

■ The double leverage method to determine a fair rate of return, was lawfully and reasonably applied in this case and its application in this case has not deprived GTSW of due process or equal protection of the law.

IV. *Working Capital.*

■ GTSW contends that the SCC's determination of GTSW's working capital was arbitrary and capricious in that it radically departs from past practice without proper notice or without reasonable justification in the record. We agree.

GTSW claimed test-year cash working capital of $231,190.00 in its intrastate rate base. The amount was calculated on the basis of a method approved and utilized by the SCC in prior telephone rate cases, i.e., ⅟₃₆th of test year operating and tax costs. Staff witness Flaherty used a novel and different method, i.e., a thirteen month average of GTSW's bank balances allocated to New Mexico operations, and concluded that GTSW's test-year working capital should be $65,629.00. The SCC adopted Flaherty's calculation. In seeking to justify its departure from past practice, the SCC said:

GTSW's proposal for a working capital allowance is founded solely on the basis that the formula utilized was approved by the Commission in GTSW's prior rate case. GTSW provided no justification that the formula utilized is proper under present circumstances. Furthermore, a working capital allowance should reflect the time lags which work in favor of the company as well as those which work against it. There is no evidence that GTSW's formula properly recognizes the present lead-lag relationship now in existence. As such, good cause exists for the Commission to change the methodology previously used by the Commission to determine working capital.

The record does not reflect prior notice to GTSW of any "changed circumstances" affecting the method of calculating cash working capital since prior orders of the SCC approved the method utilized by GTSW. There is nothing in the record indicating that SCC staff expert Flaherty's method of cash working capital recognizes or takes into account the "present lead-lag relationship." The fact of the matter is that neither method—that of GTSW or that of Flaherty—incorporates the laborious and expensive process of determining lead-lag relationships. Furthermore, GTSW witness McGaughey explained that "the formula method of ⅟₃₆ or 10 days of operating expenses and taxes as adopted by the New Mexico Corporation Commission is a preferable method." Mr. McGaughey testified:

The formula approach is the most commonly used method for determining a working capital allowance. This approach seeks to measure, in terms of days or portions of a year, the period over which operations and maintenance expenses must be met by funds invested in the enterprise prior to the replenishment of those funds through cash collections from customers.

The greatest advantage of the use of the formula approach in determining an allowance for working capital may be in the avoidance of unnecessary and unproductive costs of extensive studies by utilities and intervenors. It is a straight forward method which is usually based on data that can be obtained and verified easily. It is also directly related to the operating and other costs found to be reasonable in the particular jurisdiction in the particular case and it can be readily adjusted for the effect of proforma adjustments. It should, therefore, produce a reasonable working capital allowance.

In *Southern Union Gas Co. v. New Mexico Pub. Serv. Com'n.*, 84 N.M. 330, 333, 503 P.2d 310, 313 (1972), this Court stated:

In the present case, the district court also held the nonapplication of the cost of capital percentage to be unreasonable and unlawful because in the preceding cause between the same parties, Cause No. 31074, supra, the cost of capital was actually used as the rate of return. In addition, there was no evidence of changed circumstances which would justify a departure from previous Commission procedure. * * * Although a Commission should be able to change its procedure, it should not arbitrarily or capriciously do so without good reasons.

In *Hobbs Gas Co. v. New Mexico Pub. Serv.*, 94 N.M. 731, 735, 616 P.2d 1116, 1120 (1980), this Court said:

The action taken by the Commission in this case in deducting approximately $505,583 as plant acquisition adjustment from Hobbs' actual equity capital is unprecedented and contrary to previous policy of the Commission and previous orders of the Commission. The Commis-

sion's staff witness concedes that this is a recommended change in policy but the record does not reflect substantial evidence to sustain the Commission's refusal to include the above amount as a plant acquisition adjustment.

The SCC's radical departure from past practice in determining GTSW's cash working capital without sufficient prior notice of departure and without reasonable justification as reflected by the record in this case was improper. The sum of $231,190.00 instead of $65,629.00 for working capital should be included in GTSW's intrastate rate base.

V. *Penalty Based on Quality of Service.*

 GTSW contends that the SCC has no authority to penalize a utility for reasons relating to quality of service in a ratemaking proceeding, and in any event, in purporting to do so, the SCC violated GTSW's right to due process of law.

The SCC in its order determined that GTSW was not providing satisfactory service, and, as a result, felt "constrain[ed]" to grant only an 11.50% overall rate of return rather than the 11.91% which would have been granted in the absence of service inadequacies. The SCC may not demand rate forfeitures on service deficiencies from a regulated company for noncompliance with its after-the-fact determination of a fair and reasonable rate of return. To the contrary, the SCC had a constitutional duty in a rate case to adopt rates that " 'will allow [GTSW] to operate successfully, maintain its financial integrity, attract capital, and compensate its investors for the risk assumed.' " *State v. Mountain States Tel. & Tel. Co.*, 54 N.M. 315, 336, 224 P.2d 155, 170 (1950). Here, the SCC clearly determined that it would grant "an 11.91% rate of return * * * in the absence of service inadequacies." Thus, it expressly held that rate of return to be reasonable on the basis of its analysis of revenues, costs, the rate base, and an appropriate return on capital. Having proceeded to find that an 11.91% rate of return was fair and reasonable, the SCC not only refused to implement that

finding by instituting rates based thereon, but also applied a penalty for lack of quality of service. This was improper under the circumstances, as they appear in this case.

When a utility satisfies its burden of proof and establishes a revenue deficiency of a given amount, as the SCC admitted GTSW did here, it becomes the duty of the SCC to move forward and implement rates to recover the deficiency. This Court so held in *Mountain States Tel. v. New Mexico State Corp., supra,* 90 N.M. at 334, 563 P.2d at 597, 598, emphasizing that the "failure of a regulatory commission to provide for rates that will provide a reasonable rate of return therefore constituted a violation of due process" and that failure to increase the rates was an unconstitutional confiscation of the Company's property without due process of law.

The deduction of 41% from the rate of return determined to be just and reasonable is in conflict with the SCC's own finding as to the necessary rate of return, and exceeded the SCC's authority. In *Hobbs Gas Co. v. New Mexico Pub. Serv. Commission, supra,* this Court held that the Public Service Commission could not thus nullify its own determination as to the required rate of return:

> This deduction, combined with other deductions, resulted in a return on actual equity capital of only 7.5 percent rather the 15 percent which the Commission admits to be a "just and reasonable" return on equity.

*Id.* at 735, 616 P.2d at 1120.

The Illinois Supreme Court rejected an attempt to police a telephone company's performance by denying it rate relief to which it was entitled. In *Village of Apple River v. Illinois Commerce Com'n.,* 18 Ill.2d 518, 165 N.E.2d 329 (1960), the court held that the completion of service improvements was irrelevant in a rate proceeding, unless it could be shown to bear upon the rate base:

> Indeed, compliance with the prior order is material to this inquiry only if there is

any matter in connection with that prior order that relates to the existing valuation of the company's property in order to determine whether or not the proposed rate increase results in a fair return. * * In any event, however, noncompliance with the prior order is not itself an adequate basis for determining that the present application for a rate increase should be denied.

165 N.E.2d at 333.

In *Elyria Tel. Co. v. Public Utilities Commission,* 158 Ohio St. 441, 110 N.E.2d 59 (1953), the Ohio Supreme Court considered the:

> [P]ower of the commission to condition a rate increase on the completion of certain improvements in the facilities of the company in view of a prior finding that the pre-existing rates are inadequate when computed in relation to the existing company property.

110 N.E.2d at 62.

The court held that after the commission determined the existing rates were inadequate, "it became the duty of the commission to set just and reasonable rates." *Id.* at 62. There was no authority to reduce or condition such rates on the improvement of service. *See also General Telephone Co. v. Michigan Public Serv. Com'n,* 341 Mich. 620, 67 N.W.2d 882 (1954).

In *Southern Bell Teleph. & Teleg. Co. v. P.S.C.,* 28 Pub. Util. Rep. (PUR) 3d 303 (La.19th Jud.Dist.1959), the state commission had determined a "just and reasonable" rate increase but refused to put it into effect, because " 'the company has rendered grossly inadequate service to its Louisiana subscribers and has arbitrarily curtailed a necessary expansion program in this state.' " *Id.* at 304. On review, the court directed adoption of rates sufficient to secure the revenue to which the utility was entitled, holding that "the order of the commission refusing to effectuate the rate increase which it found to be adequate was improper." *Id.* at 307.

In Florida the state supreme court voided the commission's attempt to penalize a telephone company for poor service by denying it a rate increase to which it was entitled. *Florida Tel. Corp. v. Carter,* 70 So.2d 508 (Fla.1954). The court held that an attempt to enforce service standards by denying lawful rates was invalid:

> The respondent-Commission had no authority to deny an increase in rates which it found to be just, by the means of inflicting a penalty because of poor or inadequate service, and exceeded its jurisdiction when it inflicted such penalty in a rate-making proceeding.

70 So.2d at 510.

The Florida statutes were amended to enable the commission to consider service quality in rate cases, and still the Florida courts held that lawfully mandated rates should not be denied on the ground of inadequate service. *Askew v. Bevis,* 37 Fla. Supp. 63, 283 So.2d 337 (1973).

For similar reasons, the Pennsylvania Public Utilities Commission has stated that "[i]n a rate proceeding, the adequacy of the service rendered by respondent cannot be considered at issue inasmuch as the purpose of the proceeding is to adjudicate the fairness or reasonableness of respondent's rates." *Southern Teleph. Co. v. United Teleph. Co.,* 5 Pub. Util. Rep. (PUR) 3d 75, 79 (Pa.P.U.C.1954).

The North Carolina Utilities Commission likewise recognized that to deny rate relief in retaliation for service deficiencies would perpetuate, rather than remedy, such inadequacies:

> The Burnsville protestants further contend that no increase in rates should be allowed, for the additional reason that the applicant has not met the demand for expanded service in the Burnsville territory. * * * A public utility company can expand its services only by the use of new capital, which can be acquired only from the sale of additional capital stock, bonds, or by loans. To successfully seek such new capital, a company must present a sound financial condition, and show that it is earning a fair and reasonable return on its present investments. Thus to give the applicant a reasonable rate of return on its present investments is the first step toward obtaining an expansion of its services into unserved areas throughout its entire territory.

*Re Carolina Mountain Teleph. Co.,* 89 Pub. Util.Rep. (PUR) NS 13, 19–20 (N.C.U.C. 1951).

We agree with the rationale stated in the foregoing cases, that a regulatory commission has no authority to deny an increase in rates in an amount which it has first found to be just, fair and reasonable, by means of imposing a subsequent penalty for poor or inadequate service. However, this does not preclude the SCC from properly considering in a rate proceeding, quality or inadequacy of service in determining, under the facts and circumstances in each particular case, what is a fair, just and reasonable rate of return to the utility. We conclude in this case that once the SCC had arrived at a fair and reasonable rate of return, it had no authority to penalize a utility for reasons relating to the quality of service in a rate-making proceeding.

The order of the SCC is remanded to the Corporation Commission for further proceedings consistent with the results reached in this opinion.

IT IS SO ORDERED.

PAYNE and RIORDAN, JJ., concur.