715 P.2d 1332 (1986)
104 N.M. 36
In the Matter of the RATES AND CHARGES OF the MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY:
MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY, Applicant-Appellant,
v.
NEW MEXICO STATE CORPORATION COMMISSION, Respondent-Appellee.
No. 15365.
Supreme Court of New Mexico.
March 17, 1986.
Cameron R. Graham, Albuquerque, W. Douglas Hickey, Cheyenne, Wyo., Sutin, Thayer & Browne, Richard L.C. Virtue, Randy S. Bartell, Santa Fe, for applicant-appellant.
*1333 Paul Bardacke, Atty. Gen., R. Michael Barlow, Asst. Atty. Gen., Santa Fe, Maureen Sanders, Gen. Counsel, Daniel J. Herbison, Asst. Gen. Counsel, Santa Fe, for appellee N.M. Corp. Com'n.
Patrick T. Ortiz, Com'n Counsel, Joanne Reuter, Asst. Com'n Counsel, Santa Fe, for amicus curiae N.M. Service Com'n.

OPINION
STOWERS, Justice.
This case is before us upon removal from the New Mexico State Corporation Commission (Commission), following the Commission's order denying in part a rate increase applied for by Mountain States Telephone and Telegraph Company (Mountain Bell). Mountain Bell contends that the Commission erred, first, in ordering it to make certain accounting entries relating to the tax treatment of consumer premises equipment (CPE) and, second, in ordering it henceforth to account for state income taxes on a flow-through, rather than a normalization, basis. We reverse the Commission's decision on the former question, affirm on the latter, and remand to the Commission for further proceedings.

I.
On June 17, 1983, Mountain Bell filed an application with the Commission, under Docket No. 1032, seeking approval of proposed tariff changes. Its major request was for permanent tariff changes to take effect on January 1, 1984, coincident with the restructuring of Mountain Bell as an independent Bell Operating Company divested, under federal court order, from American Telephone and Telegraph Company (AT & T). See United States v. American Telephone and Telegraph Co., 552 F. Supp. 131 (D.D.C. 1982) (AT & T I), aff'd sub nom. Maryland v. United States, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983); United States v. Western Electric Co., 569 F. Supp. 1057 (D.D.C.) (AT & T II), aff'd sub nom. California v. United States, 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983). On that date, Mountain Bell was to transfer its CPE assets to AT & T, and, furthermore, to transfer books of account relating to CPE. AT & T I, 552 F. Supp. at 192 and n. 248.
Because Mountain Bell's status was to be changed radically after December 31, 1983, the Commission sought testimony and evidence predicting Mountain Bell's revenue needs for a fully future test year, 1984. Mountain Bell proposed permanent tariff changes designed to produce additional revenues of $86,084,000 during 1984, a request later reduced to $61,357,000.
In addition, Mountain Bell sought immediate rate relief of $1,681,000, designed to offset increased depreciation expenses resulting from Federal Communications Commission orders. This relief was granted in July 1983 after separate hearings, and is not at issue in this case. Mountain Bell also sought interim rate relief designed to produce additional revenues of $31,930,000 during the six-month pendency of this rate application proceeding. After hearings on the matter, the Commission denied the request in September 1983, and this Court has affirmed that decision in a separate removal proceeding. See Mountain States Telephone and Telegraph Co. v. New Mexico State Corporation Commission, 102 N.M. 409, 696 P.2d 1002 (1985).
Only the Commission's order regarding permanent tariff changes is before us today. The Commission conducted public hearings on Mountain Bell's request in November and December 1983, and issued its final order in Docket No. 1032 on December 16, 1983. That order authorized a permanent increase in Mountain Bell's tariffs, but also ordered that certain accounting adjustments be made to its rate base and operating expenses, resulting in net additional revenues of $33,693,289. After its motion for rehearing was denied, Mountain Bell petitioned the Commission for an order of removal to this Court, which was granted. See N.M. Const. art. XI, § 7.
It is our duty to decide on their merits cases removed from the Commission. N.M. Const. art. XI, § 7. We have articulated the standard of review applicable to removal proceedings as follows:

*1334 [T]his Court is not a ratemaking body and has no authority to determine what is a fair rate, but this Court will weigh the evidence to arrive at an independent determination as to whether the order entered by the SCC is just and reasonable and if not, then remand to the SCC for further proceedings not inconsistent with our independent determination.
General Telephone Co. of the Southwest v. Corporation Commission, 98 N.M. 749, 753, 652 P.2d 1200, 1204 (1982) (emphasis in original).

II.
Mountain Bell here objects to the portions of the Commission's order directing Mountain Bell to make accounting adjustments designed to reduce the intrastate income tax expenses that the company will recover from its ratepayers. The Commission ordered Mountain Bell to establish certain accounts; to credit those accounts with the amounts that were in Mountain Bell's deferred taxes and unamortized investment tax credit accounts relating to CPE before January 1, 1984, when all Mountain Bell's CPE and associated accounts were transferred to AT & T; and to amortize those amounts back to the ratepayers over the average remaining life of the transferred assets.
Put as simply as possible, prior to January 1, 1984, as a result of its ability to employ the normalization method of calculating its tax expenses for ratemaking purposes, Mountain Bell had accumulated certain accounts relating to its CPE assets. As with other wasting assets, Mountain Bell was entitled to deduct from its taxable income depreciation expenses that reflected the declining value of the CPE assets over their lifetime. See I.R.C. §§ 167 and 168 (1982 & Supp. I 1983). Under the normalization method, for tax purposes Mountain Bell calculated its actual tax expenses on an accelerated depreciation basis  that is, pursuant to Internal Revenue Service schedules, it charged relatively higher depreciation expenses in the early years of the asset's life and relatively lower expenses in the later years, resulting in lower tax payments in the early years and higher payments in the later years. Under the normalization method, for ratemaking purposes Mountain Bell reported to its regulators the tax expenses it would have experienced had it employed straight-line depreciation  that is, had it divided the original cost of the asset by its expected service lifetime, and deducted annually that quotient from its taxable income.
In the early years of the asset's life, therefore, Mountain Bell was permitted to recover from its ratepayers revenues reflecting tax expenses that the company did not in fact pay out at that time. In theory, the process would reverse itself in time, and in the later years of the asset's life, Mountain Bell would pay more in actual taxes than the ratemaking books, and the rates themselves, reflected.
The effect of normalization, therefore, may be seen as a deferral of the payment of taxes. In the interim, Mountain Bell enjoyed the use of what has been described as an "interest-free loan" of the difference between taxes paid and taxes due under the straight-line method. As a matter of accounting procedure, the difference was placed in Mountain Bell's deferred income tax account. See C. Phillips, The Regulation of Public Utilities 267-73 (1984).
Similar principles guide the normalization treatment of investment tax credits (ITCs). The Internal Revenue Code permits businesses to subtract as a credit from their annual federal income tax liability a percentage of the amount newly invested in qualified equipment put into service in that year. Although the tax credit is a one-time, lump-sum tax saving, the Internal Revenue Code permits utilities to claim it only if, for ratemaking purposes, they distribute the amount of the credit ratably over the useful life of the asset. See I.R.C. § 46(f) (1982).
In the first year of the asset's service life, therefore, Mountain Bell claimed the full credit on its federal income tax return, and was permitted to recover from its ratepayers revenues reflecting tax expenses it did not in fact pay out. In the remaining years of the asset's lifetime, however, *1335 Mountain Bell actually paid out more in taxes than it recovered from its ratepayers, whose rates were reduced by a proportionate share of the one-time credit.
The effect of normalization of ITCs is a postponed sharing of Mountain Bell's tax benefit with its ratepayers. In the interim, Mountain Bell enjoyed the interest-free use of the difference between tax expenses recovered from the ratepayers and taxes actually paid. As a matter of accounting procedure, the difference was placed in Mountain Bell's unamortized ITC account. See C. Phillips, supra, at 273-74.
On January 1, 1984, as part of the divestiture of AT & T, Mountain Bell transferred ownership of its CPE to AT & T, and with it, transferred the portions of its deferred income tax and unamortized ITC accounts related to those CPE assets. The Commission's order in Docket No. 1032 in effect requires Mountain Bell to recreate in its New Mexico regulatory books of account the intrastate portion of those CPE-related accounts by establishing separate accounts entitled "CPE Deferred Taxes Due to Ratepayers" and "CPE Unamortized Investment Tax Credits" and crediting them with the intrastate portion of the accounts transferred to AT & T. The Commission's order further requires that these accounts be amortized over the average remaining life of the transferred CPE assets; accordingly, it reduces Mountain Bell's proposed intrastate income tax expense by the amount of the first year's amortization and reduces Mountain Bell's proposed rate base by the unamortized balance of the "CPE Deferred Taxes Due to Ratepayers" account. Mountain Bell alleges that the Commission's order reduces its expected revenues under the tariff by approximately $38.8 million over a seven-year amortization period.
The reason for the Commission's actions is clear from its order and from the record: the Commission was convinced that Mountain Bell's ratepayers had funded the CPE-related accounts transferred to AT & T as "interest-free loans" associated with normalization accounting methods, through rates that reflected deferred tax expenses and postponed tax credits. The ratepayers did so involuntarily, the Commission believed, but in the expectation of benefits in the from of reduced rates in the later years of the CPE assets' lives. The Commission believed the transfer of CPE-related accounts to AT & T would increase the equity capital of Mountain Bell and its shareholders while causing the ratepayers to lose the benefits to which they were entitled, unless the Commission acted to adjust downward Mountain Bell's tariff revenues.
Mountain Bell argues that the Commission's treatment of CPE-related accounts is arbitrary, capricious, and contrary to law. Mountain Bell asserts that federal law, as established in Judge Greene's Modification of Final Judgment in the AT & T I case, preempts the portions of the Commission's order that require Mountain Bell in effect to refund to ratepayers the CPE-related intrastate deferred income taxes and unamortized tax credits that Mountain Bell transferred to AT & T. Mountain Bell also argues that the Commission's reduction in its rate base produces a rate of return on Mountain Bell's actual investment that is confiscatory and unlawful, and, furthermore, constitutes unlawful retroactive ratemaking. Finally, Mountain Bell contends that the Commission's decision is arbitrary and capricious because it is based on a legally incorrect characterization of Mountain Bell's CPE-related accounts as a capital contribution by the ratepayers, and because it jeopardizes Mountain Bell's eligibility to continue to use accelerated depreciation and to claim investment tax credits.
Because we agree with Mountain Bell that the Commission's order demonstrates an unreasonable exercise of its ratemaking authority, we need not decide whether its treatment of CPE-related accounts is preempted by federal law, whether it engaged in retroactive ratemaking, or whether the order establishes a confiscatory rate of return. The Commission's treatment of CPE-related accounts is predicated upon its conclusion that deferred income taxes and unamortized ITCs are capital contributed by Mountain Bell's ratepayers in the legitimate expectation of future benefits. Furthermore, its decision makes no attempt to *1336 justify jeopardizing Mountain Bell's eligibility for tax benefits. We believe that the Commission reached this questionable conclusion in an arbitrary and unreasonable manner; therefore, we reverse and remand for reconsideration by the Commission.
The voluminous record of Docket No. 1032 and the text of the final order indicate that the Commission regarded the critical question of the characterization of deferred income taxes and unamortized ITCs as a debate on accounting theories between Mountain Bell witness Irene G. Chavira and Commission Staff witness Michael J. Majoros, Jr., each of whom advocated a position based upon her or his view of the policy behind federal income tax deferrals and investment tax credits. Chavira considered deferred taxes and unamortized ITCs to be interest-free loans from the Treasury; Majoros considered them involuntary loans from the ratepayers. Neither witness was qualified as a lawyer, and neither offered a legal basis for his or her interpretation of the law. We cannot uncover in the record evidence that the language of the tax provisions in question, I.R.C. Sections 167(l) and 46(f) and of the relevant Treasury Regulations was examined in full. The witnesses discussed the congressional purpose behind the tax laws in a general manner without reference to the legislative histories recorded in order to guide such inquiries, and without reference to the judicial decisions interpreting these laws. Nor can we infer from its final order that the Commission studied the law and attempted to comply with it; indeed, the final order suggests that the Commission simply chose the theory, ratepayer-contributed capital, that supported its desire to minimize consumer rate increases.
Furthermore, in selecting a theory of accounting, the Commission completely failed to acknowledge the possibility that its choice of characterizations might be wrong. It left no opportunity for reconsideration in case the controlling law should be made clear. See In re Rates and Charges of the Mountain States Telephone and Telegraph Co., 99 N.M. 1, 11, 653 P.2d 501, 511 (1982). The Commission failed to address Mountain Bell's argument that the creation of these CPE-related accounts on Mountain Bell's books after the transfer to AT & T might jeopardize Mountain Bell's eligibility to employ accelerated depreciation and investment tax credits in the future, resulting in long-term higher operating costs for Mountain Bell and, thus, higher rates for its ratepayers. The Commission failed as well to consider the additional costs to Mountain Bell and its ratepayers that might result from continued litigation over CPE-associated accounts.
We believe that the Commission acted unreasonably in attempting to resolve in a vacuum the difficult question of the proper treatment of CPE-related deferred income taxes and unamortized ITCs. We appreciate that this Court has had the benefit of subsequent decisions of the Federal Communications Commission (FCC), the Internal Revenue Service, courts and public utility commissions around the United States. We note, however, that the FCC released a Notice of Proposed Rulemaking covering the treatment of CPE-related accounts on June 21, 1983, Procedures for Implementing the Detariffing of Customer Premises Equipment and Enhanced Services (Second Computer Inquiry), CC Docket No. 81-893, Notice of Proposed Rulemaking, FCC 83-181, 48 Fed.Reg. 29891. It solicited comments during the summer of 1983, and adopted a Report and Order on November 23, 1983. Although the FCC's order was not released until the day before the Commission issued its final order in this case, the Commission was aware of the FCC's comprehensive effort to analyze the questions presented here. Report and Order, In Re Procedures for Implementing the Detariffing of Customer Premises Equipment and Enhanced Services (Second Computer Inquiry), CC Docket No. 81-893, FCC 83-551, 95 F.C.C.2d 1276 (released Dec. 15, 1983). The Commission likewise ought to have been aware of the likelihood of an IRS ruling on eligibility for accelerated depreciation and ITCs; in fact, AT & T requested and, on December 29, 1983, received such a private letter ruling directed to it and the Bell Operating Companies. Since this case *1337 was removed to this Court we have granted several motions for leave to cite additional authority and to submit additional evidence, and various judicial decisions and commission orders addressing the permissible treatment of CPE-related accounts have been published. Furthermore, Mountain Bell has requested and received a declaratory ruling from the FCC holding that the FCC's orders regarding the AT & T divestiture had preempted contrary action by the Commission. In re Mountain States Telephone and Telegraph Company Preemption of and Jurisdiction over Tax Reserves and Investment Tax Credits Transferred to AT & T and Affiliated Companies, Memorandum Opinion and Order, FCC 86-11 (released Jan. 7, 1986).
We believe that the portion of the Commission's order directing the creation and return to ratepayers of accounts entitled "CPE Deferred Taxes Due to Ratepayers" and "CPE Unamortized Investment Tax Credits Due to Ratepayers" represents an arbitrary and capricious exercise of its ratemaking authority. The resulting rate order is neither just nor reasonable, and we remand this case to the Commission for further consideration. We order the Commission to include in its record upon remand the authorities cited to us in the motions we have granted. We authorize the Commission to consider as additional evidence the entire testimony of witness Majoros before the Public Service Commission of Maryland, as it requested in its Response to Motion for Leave to Submit Additional Evidence, and, furthermore, to take whatever additional evidence it considers necessary in order to reach a just and reasonable rate order.

III.
Mountain Bell also objects to the portions of the Commission's order directing it henceforth to employ the flow-through method of calculating state income taxes and to amortize the deferred state income tax accounts presently on Mountain Bell's books due to the Commission's former policy of permitting the company to normalize its state income taxes. Simply put, the flow-through method of accounting is what results when normalization is not employed  that is, for ratemaking purposes, Mountain Bell must report the tax expenses it actually pays, whether it elects to calculate its taxes on a straight-line or an accelerated depreciation basis.
As noted above, I.R.C. § 167(l) conditions the use of accelerated depreciation for calculating federal taxable income upon the use of the normalization method of accounting for ratemaking purpose. The Commission recognized that requirement of federal tax law, and ordered the flow-through treatment of state income taxes only. The reason for the Commission's action is clear from its order and from the record: it wanted to protect the ratepayers from the possibility, inherent in normalization accounting, that Mountain Bell would enjoy an "interest-free loan" of deferred taxes without sharing the full benefits with its ratepayers in later years.
Mountain Bell argues that the Commission's order requiring flow-through treatment of state income taxes is an arbitrary and capricious change from its previous policy of permitting normalization treatment. Mountain Bell further contends that the Commission's order is contrary to New Mexico income tax law and will prevent Mountain Bell from using accelerated depreciation for state income tax purposes.
As a preliminary matter, we consider Mountain Bell's procedural attack on the Commission's change of policy to be without merit. Mountain Bell argues that the Commission's change from normalization to flow-through methodology for calculating state income taxes is arbitrary and capricious, a "radical departure from past practice ... without sufficient prior notice of departure and without reasonable justification as reflected by the record... ." General Telephone Company of the Southwest v. Corporation Commission, 98 N.M. at 756, 652 P.2d at 1207. We disagree.
First, while the change of method in this case represents a departure from long-standing Commission policy, we have held that a commission may change its procedures so long as it does not act arbitrarily *1338 or capriciously. Southern Union Gas Co. v. New Mexico Public Service Commission, 84 N.M. 330, 333, 503 P.2d 310, 313 (1972). Second, we cannot accept Mountain Bell's contention of insufficient prior notice that flow-through accounting would be considered. It received prefiled testimony of staff and intervenor witnesses proposing to change to the flow-through method, responded with prefiled rebuttal testimony opposing the change, and offered further testimony at the Commission's public hearings. Third, we are satisfied that the record reflects reasonable justification for this change. In light of the AT & T divestiture and the special procedures adopted by the Commission for this rate case, we find incredible Mountain Bell's contention that it was without notice of any "changed circumstances." Moreover, the flow-through method here adopted by the Commission, unlike the novel valuation method we rejected in General Telephone Co. of the Southwest v. Corporation Commission, is a widely recognized accounting method frequently employed in other states, which undoubtedly will achieve the legitimate goals of providing Mountain Bell with revenues to recover its tax expenses and of protecting ratepayers from future problems associated with divestiture. See 98 N.M. at 755-56, 652 P.2d at 1206-07. The Commission's change to the flow-through method of calculating state income tax expenses for ratemaking purposes was not an arbitrary and capricious departure from past Commission practice without proper notice and reasonable justification in the record.
Mountain Bell primarily attacks on substantive grounds the Commission's requirement of flow-through treatment of state income taxes. Mountain Bell argues that New Mexico law adopts the Internal Revenue Code and Treasury Regulations for determination of state income taxes, including I.R.C. § 167(l)(2), which permits utilities to use accelerated depreciation methods only if they use a normalization method of accounting for ratemaking purposes. It further contends that in incorporating this provision of federal law, the Legislature intended to provide companies like Mountain Bell with the interest-free loans of capital that arise under normalization. Mountain Bell concludes that the Commission's flow-through order denies it the benefits of normalization in violation of the Legislature's intent, and therefore is contrary to law.
We reject each premise of Mountain Bell's argument. After an independent analysis of New Mexico income taxation law, we conclude that the Commission's flow-through order does not deny Mountain Bell the use of accelerated depreciation methodology for New Mexico income tax purposes, nor is it contrary to law as a violation of the Legislature's intent.
NMSA 1978, Section 7-2A-3 (Repl.Pamp. 1983), states that "[a] tax is imposed at the rate specified ... upon the net income of every domestic corporation and upon the net income of every foreign corporation employed ... in the transaction of business in ... this state... ." "Net income" means "base income" adjusted in accordance with NMSA 1978, Subsection 7-2A-2(N) (Repl.Pamp. 1983), and "base income" means "that part of the taxpayer's income defined as taxable income and upon which the federal income tax is calculated in the Internal Revenue Code for income tax purposes." NMSA 1978, § 7-2A-2(M) (Repl. Pamp. 1983).
New Mexico courts repeatedly have held that the phrase "taxable income and upon which the federal income tax is calculated" is unambiguous and self-explanatory, and repeatedly have upheld the state's power to gauge its income tax by reference to the income upon which the taxpayer is required to pay a tax to the United States. Taxation and Revenue Department v. F.W. Woolworth Co., 95 N.M. 519, 522-523, 624 P.2d 28, 31-32 (1981), rev'd on other grounds, 458 U.S. 354, 102 S.Ct. 3128, 73 L.Ed.2d 819 (1982); Getty Oil Co. v. Taxation and Revenue Department, 93 N.M. 589, 592, 593, 603 P.2d 328, 331, 332 (Ct. App. 1979); Champion International Corp. v. Bureau of Revenue, 88 N.M. 411, 416, 540 P.2d 1300, 1305 (Ct.App.), cert. denied, 89 N.M. 5, 546 P.2d 70 (1975). Subject *1339 to certain limitations regarding income derived from out-of-state subsidiaries not applicable in this case, New Mexico can, and does, simply call for each taxpayer to insert on its state income tax form the figure reported as federal taxable income on its federal forms. Taxation and Revenue Department v. F.W. Woolworth Co., 95 N.M. at 522, 624 P.2d at 31; see also F.W. Woolworth Co. v. Taxation and Revenue Department, 458 U.S. at 363, 102 S.Ct. at ___, (unitary business limitation); Getty Oil Co. v. Taxation and Revenue Department, 93 N.M. at 593, 603 P.2d at 331 (consolidated federal return limitation).
New Mexico's Corporate Income Tax Act, NMSA 1978, Sections 7-2A-1 to -14 (Repl.Pamp. 1983 and Cum.Supp. 1985), therefore does not incorporate or adopt the Internal Revenue Code and Treasury Regulations word for word. New Mexico taxpayers are not instructed to prepare their state returns by following the provisions of the Internal Revenue Code, inserting the words "New Mexico" or "state" at appropriate points, but simply are required to use the single figure calculated to be their federal taxable income as the starting point for calculating state income tax. NMSA 1978, § 7-2A-2 and -3 (Repl.Pamp. 1983).
Nowhere in its New Mexico income tax return is Mountain Bell asked to calculate its depreciation expense. In preparing its state income tax return, Mountain Bell is never confronted with the election of a depreciation method, and is never compelled to comply with I.R.C. Subsection 167(l)(2), which ties the use of accelerated depreciation methodologies to a utility's use of normalization accounting for ratemaking purposes. Mountain Bell's New Mexico income tax return reflects accelerated depreciation only because Mountain Bell has elected to use an accelerated method of calculating depreciation expenses in preparing its federal return. This election affects its federal taxable income and, thus, its New Mexico base income.
Furthermore, Mountain Bell's eligibility to use accelerated depreciation methodologies under I.R.C. § 167(l) for calculation of its federal income taxes is not jeopardized by the Commission's requirement that it flow through state income tax expenses for intrastate ratemaking purposes. Mountain Bell admits as much, and Treas.Reg. Section 1.167(1)-1(a)(1) (1974) makes it perfectly clear:
The normalization requirement of Section 167(l) with respect to public utility property defined in Section 167(l)(3)(A) pertains only to the deferral of federal income tax liability resulting from the use of [normalization accounting]... . Regulations under Section 167(l) do not pertain to other book-tax timing differences with respect to State income taxes ... . (Emphasis added.)
The Commission's final order recognizes that normalization is a prerequisite to the use of accelerated depreciation methodologies for federal, but not state, income tax purposes. Courts and utility commissions of many jurisdictions have so held. See, e.g., City of Los Angeles v. Public Utilities Commission, 7 Cal.3d 331, 102 Cal. Rptr. 313, 497 P.2d 785 (1972) (en banc); Office of the Public Counsellor v. Indiana & Michigan Electric Co., 416 N.E.2d 161 (Ind. App. 1981); Central Maine Power Co. v. Public Utilities Commission, 382 A.2d 302 (Me. 1978); Barasch v. Pennsylvania Public Utility Commission, 507 Pa. 496, 491 A.2d 94 (1985); Pennsylvania Public Utility Commission v. Philadelphia Electric Co., 33 Pub.Util.Rep. 4th 319 (Pa.Pub. Util.Comm., Jan. 4, 1980); In re Application of AT & T Communications of the Mountain States, Inc. for Authority to Increase its Rates and Charges, Util.L. Rep. (CCH) ¶ 24,787.05 (Utah Pub.Util. Comm., May 3, 1985).
In summary, New Mexico income taxation law does not adopt directly the Internal Revenue Code and Treasury Regulations, but does permit New Mexico taxpayers to enjoy the benefits of their election to use accelerated depreciation methodologies in calculating federal taxable income. The Commission's order of flow-through accounting for state income tax purposes does not impair or jeopardize Mountain Bell's eligibility to make this federal election, or, therefore, to enjoy state income tax benefits associated with accelerated *1340 depreciation methods. We are not persuaded by Mountain Bell's argument that the Commission's order is contrary to New Mexico state income tax law.
Nor do we find persuasive Mountain Bell's argument that the Commission's flow-through order is contrary to the intent of the Legislature. As we have noted, the Legislature did not adopt word for word each provision of the Internal Revenue Code; nor did it adopt the voluminous legislative histories and the multifarious congressional intentions behind each provision. It simply chose to use the federal taxable income figure as a convenient, inexpensive, verifiable starting point for the calculation of state income taxes. Taxation and Revenue Department v. F.W. Woolworth Co., 95 N.M. at 522, 624 P.2d at 31 (citing Getty Oil Co. v. Taxation and Revenue Department, 93 N.M. at 592, 603 P.2d at 331).
In enacting the Corporate Income Tax Act, the Legislature was concerned with questions of tax liability, not with questions of public utility ratemaking. Accordingly, it required taxpayers to "use the same accounting methods for reporting income for New Mexico income tax purposes as are used in reporting income for federal income tax purposes." NMSA 1978, § 7-2A-11 (Repl.Pamp. 1983) (emphasis added); see also NMSA 1978, § 7-1-10 (Repl.Pamp. 1983). As we have held, the Commission's order does not prevent Mountain Bell from utilizing accelerated depreciation methodologies in calculating its federal income taxes, nor from calculating its state income taxes accordingly.
We will not impute to the Legislature an intention, nowhere apparent in our tax laws, to confine the Commission's broad discretion in fixing "reasonable and just" rates, provided that "due consideration shall be given to the earnings, investment and expenditures as a whole within the state." N.M. Const. art XI, § 7. Indeed, the New Mexico Constitution grants the Commission plenary ratemaking authority of a legislative nature, and denies the Legislature such power. Mountain States Telephone and Telegraph Co. v. New Mexico State Corporation Commission, 90 N.M. 325, 334, 563 P.2d 588, 597 (1977). We hold that requiring the use of normalization accounting for the calculation of state income taxes for ratemaking purposes is a ratemaking decision properly made by the Commission, when, as here, it has acted within its constitutional mandate and in accordance with constitutional notice requirements. See General Telephone Co. of the Southwest v. Corporation Commission, 98 N.M. at 755, 652 P.2d at 1206.
We remand this case to the Commission for further proceedings consistent with this opinion.
IT IS SO ORDERED.
RIORDAN, C.J., and FEDERICI, J., concur.