858 P.2d 54

**HOBBS GAS COMPANY, Appellant,**

v.

**NEW MEXICO PUBLIC SERVICE COMMISSION, Appellee.**

Nos. 20558, 20759.

Supreme Court of New Mexico.

June 22, 1993.

Rehearing Denied July 28, 1993.

Simons, Cuddy & Friedman, Daniel H. Friedman, Santa Fe, for appellant.

Lee Huffman, Com'n Counsel, Santa Fe, for appellee.

### *OPINION*

FRANCHINI, Justice.

In these consolidated cases, Hobbs Gas Company (Hobbs) seeks review of two orders of the New Mexico Public Service Commission (Commission) pursuant to NMSA 1978, Sections 62–11–1 to –6 (Repl.Pamp.1984). The April 1, 1992, order in Case No. 2369 denied Hobbs' application for continued use of its purchased gas adjustment clause (PGAC) and required Hobbs to refund its customers close to one million dollars in "overcollections" relating to the period September 1, 1988, to August 31, 1990. The order also disapproved Hobbs' PGAC reconciliation report for the period September 1, 1990, to August 31, 1991. Hobbs was required to file a revised reconciliation report containing computations mandated by the order and to refund approximately $521,389 in "overcollections" later identified by the Commission for that period. Finally, the Commission ordered Hobbs to cease charging its ratepayers for "free gas," to file a rate case by July 1, 1992, and to propose appropriate overcollection refund schedules.

The other case under review, Case No. 2454, concerns Hobbs' noncompliance with the Commission's prior order to cease charging ratepayers through its PGAC for "free gas" and to implement the correct methodology determined by the Commission in the earlier case. The order directs Hobbs to utilize the Commission's methodology in determining its PGAC. Pursuant to Section 62–11–5, we annul and vacate both orders of the Commission.

### I.

Hobbs has included a PGAC in its tariffs since 1981. A PGAC allows a company to periodically adjust rates to reflect changes in the unit cost of gas supplies. This protects a natural gas utility from sudden increases in its fuel costs by allowing the utility to pass on the increased fuel costs without having to undergo a rate case. Similarly, ratepayers automatically receive any reductions in fuel costs, without the delay of a rate case. In order to continue use of a PGAC, a utility must file an application for approval by the Commission pursuant to Purchased Gas Adjustment Clauses For Gas Utilities, NMPSC Rule 640 (June 30, 1988). Rule 640 requires a gas utility to apply to the Commission every two years for permission to continue use of the PGAC for the next two-year period. The application process requires the submission of a reconciliation audit, by which under- or overcollections for the preceding period are computed.

Rule 640.16(d) provides that the utility can either include a portion of its gas costs in its basic rates with the remaining portions to be collected through the PGAC (base rate/PGAC), or it can separate gas costs entirely from other costs, including any gas losses, through the PGAC. Hobbs uses the base rate/PGAC methodology. This form of PGAC does not contemplate a dollar-for-dollar pass through of gas costs or savings insofar as line losses and savings from reduction of line losses are concerned. Where a portion of gas costs is included in a utility's base rates, Rule 640 requires the use of a "purchase/sale ratio" in the computation of gas cost and reconciliation factors used to increase or decrease the amount of recovery under the utility's rate schedules. Where a utility has experienced significant line losses, the utility will purchase more gas to meet its customers' requirements without increased sales; accordingly, the ratio of purchases to sales will exceed one. Conversely, should a utility receive unbilled gas from its suppliers, the ratio of purchases to sales will be less than one.

Since 1985, Hobbs has received a portion of its purchased gas from suppliers without being charged for it, possibly from meter malfunctions, meter-reading errors, or oth-

er causes. In its application in Case No. 2369, as in its two preceding PGAC continuation filings, Hobbs used the same methodology for computing the portion of its costs of gas recovered through base rates and for computing its reconciliation factor. The purchase/sale ratio reported in computing the reconciliation factor and the purchase/sale ratio utilized in computing the portion of the gas recovered through base rates were determined using the amount of gas it had purchased in the numerator of the ratio and the amount of gas sold to its customers in the denominator. This was apparent from the fact that the purchase/sale ratio shown in these calculations was less than one.[1] In Case No. 2081, the Commission granted Hobbs the continued use of its PGAC for the periods ending August 31, 1985, and August 31, 1987. In Case No. 2246, the Commission granted Hobbs the continued use of its PGAC for the periods ending August 31, 1988, and August 31, 1989. In Case No. 2369 (one of the cases on review here) the Hearing Officer ruled that Section 640.21, when read in its entirety, requires that delivered units (which includes the unmetered, cost-free gas) be used in the numerator of the purchase/sale ratio. Even though Hobbs' use of purchased units in the numerator of the purchase/sale ratio had been tacitly approved in the two prior PGAC continuation cases, the Commission adopted the Hearing Officer's recommendation that the purchase/sale ratio be recalculated using the newly recognized "proper" methodology, thus holding Hobbs responsible for a refund of the difference in the sums as recalculated.

## II.

■ Judicial review of a Commission's order is limited to a determination of whether the Commission acted fraudulently, arbitrarily, or capriciously, and whether the Commission's order is supported by substantial evidence. *Llano, Inc. v. Southern Union Gas Co.*, 75 N.M. 7, 11–

12, 399 P.2d 646, 651 (1964). The burden is on Hobbs to show that the order of the Commission is unreasonable or unlawful. Section 62–11–4; *Behles v. New Mexico Pub. Serv. Comm'n (In re Timberon Water Co.)*, 114 N.M. 154, 156, 836 P.2d 73, 75 (1992). This Court has no power to modify the order appealed from, but "shall either affirm or annul and vacate the same." Section 62–11–5. We are required to "vacate and annul the order complained of if it is made to appear to the satisfaction of the court that the order is unreasonable or unlawful." *Id.* If we vacate the order, we must "vacate and set aside en toto." *Transcontinental Bus Sys., Inc. v. State Corp. Comm'n*, 56 N.M. 158, 167, 241 P.2d 829, 835 (1952). We are "powerless to change, modify or amend an order by holding part of it lawful and reasonable and another part or parts unlawful or unreasonable." *Id.* The limitations on our power to amend or modify Commission orders are soundly grounded in the separation of powers. Amending or modifying Commission orders would be substituting our judgment for that of the Commission, and we thus would be acting legislatively and not judicially. *Id.* at 169, 241 P.2d at 836. However, we are not precluded from declaring or determining that parts of a Commission order are unlawful and/or unreasonable (which requires vacating and annulling en toto) but at the same time declaring other parts of the order to be reasonable and lawful. Following remand to the Commission, the Commission may properly enter an order embodying those provisions in the earlier, vacated order that have been declared reasonable and lawful. *See Public Serv. Co. v. New Mexico Pub. Serv. Comm'n*, 92 N.M. 721, 723, 594 P.2d 1177, 1179 (1979) (remanding case to Commission for entry of new order based on substantial evidence).

■ Hobbs contends that requiring PGAC refunds for the period September 1, 1988, to May 1, 1992, is unreasonable and unlawful. We partially agree. "Although a Commission should be able to change its

---

**1.** Since 1985, Hobbs has filed dozens of documents disclosing that more gas was sold than purchased and that the company was experiencing negative line losses. These documents include six years of annual reports and two sets of PGAC continuation filings.

procedure, it should not arbitrarily or capriciously do so without good reasons." *Southern Union Gas Co. v. New Mexico Pub. Serv. Comm'n,* 84 N.M. 330, 333, 503 P.2d 310, 313 (1972). Thus, regulatory treatment which "radically departs from past practice without proper notice" will not be sustained. *General Tel. Co. v. Corporation Comm'n,* 98 N.M. 749, 755–56, 652 P.2d 1200, 1206–07 (1982).

In *General Telephone,* the Commission utilized a novel and different method of calculating General Telephone's working capital in a rate case. General Telephone had calculated its working capital on the basis of a method approved and utilized by the Commission in prior rate cases. The Commission asserted that it was not bound by any particular method in determining rates. We disagreed, stating:

> The [Commission] is bound by, and limited to, its existing rules and regulations, proper application of the law, compliance with the constitutional mandate, and by previously established methods of rate-making, absent a change in circumstances peculiar to the company and the pending case, making it necessary that there be a departure from established method.

*General Telephone,* 98 N.M. at 755, 652 P.2d at 1206.

Applying this standard to the Commission's change of position, we noted that "[t]he record does not reflect prior notice to [General Telephone] of any 'changed circumstances' affecting the method of calculating cash working capital since prior orders of the [Commission] approved the method utilized by [General Telephone]." *Id.* Prior notice is required before any prospective change in policy can be made. To allow a radical departure from past practice, such as a new method of calculating the PGAC, to have retroactive effect without putting the utility on notice that such a change was contemplated would be inconsistent with our opinion in *General Telephone.*

In *Hobbs Gas Co. v. New Mexico Public Service Commission,* 94 N.M. 731, 735–36, 616 P.2d 1116, 1120–21 (1980), this Court held that application of the principles of res judicata and equitable estoppel in review of a Commission order was not error. In *Hobbs,* we upheld a lower court determination that the Commission was equitably estopped from retroactively applying a valuation policy which was "unprecedented and contrary to previous policy of the Commission and previous orders of the Commission." *Id.* at 735, 616 P.2d at 1120. While acknowledging that the Commission was free "to adapt to changes in circumstances in the rate-making determination from one year to the next," we also stated that the Commission may still "be bound by prior decisions as they affect a particular factual situation." *Id.* at 736, 616 P.2d at 1121. Thus, we stated:

> [T]he trial court found that the specific issue of acquisition adjustment had been dealt with by the Commission in a previous proceeding in a manner inconsistent with its theory in this case. Under the facts in this case that inconsistency was not allowed by the district court. We affirm the trial court on this issue.

*Id.*

*Mountain States Telephone & Telegraph Co. v. New Mexico State Corp. Commission,* 104 N.M. 36, 715 P.2d 1332 (1986), is also instructive to our analysis. In *Mountain States,* we held that the Commission's prospective "change in methodology" was not an arbitrary and capricious departure from past Commission practice because Mountain Bell had received proper notice of the proposed change and the Commission had demonstrated that the change was justified. *Id.* at 41–42, 715 P.2d at 1337–38. Prior notice was shown by Mountain Bell's receipt of prefiled testimony of staff and intervenor witnesses proposing to change to the flow-through method of calculating state income tax.

Thus, *Hobbs, General Telephone* and *Mountain States* instruct us that a regulatory body is not free to change its position without good cause and prior notice to the affected parties, if the regulatory change is to be imposed retroactively. Other courts recognize that while regulatory interpreta-

tions can have retroactive effect, it is necessary to balance the competing interests to determine whether that effect is desirable or permissible. *See generally* 4 Kenneth C. Davis, *Administrative Law Treatise* § 20:7 (2d ed. 1983) (examining retroactive lawmaking). While we approved the application of principles of equitable estoppel under these circumstances in *Hobbs,* courts, including this one, are generally circumspect in the use of estoppel against government agencies. *See Rainaldi v. Public Employees Retirement Bd.,* 115 N.M. 650, 658, 857 P.2d 761, 769 (1993); *see also* 4 Davis, *supra,* § 20:2 ("... Supreme Court law has moved unevenly from a rigid refusal in all circumstances to apply equitable estoppel against the government to the present somewhat uncertain law that the government may be estopped in some circumstances.") Rather than analyzing the propriety of applying new regulatory interpretations retroactively as an equitable estoppel problem, courts tend to use a "retroactive lawmaking" analysis. As Davis notes: "An agency that creates law could be 'estopped' from departing from that law with respect to a party who has relied and who has had insufficient notice of the contemplated change; the customary language is not 'estoppel' but 'retroactive lawmaking.'" 4 Davis, *supra,* § 20.12.

By approving Hobbs' prior PGAC's, the Commission established a practice of calculating purchase/sale ratios on the basis of gas purchased. In changing this interpretation in the most recent PGAC hearing so as to base the purchase/sale ratio on gas delivered, the Commission made its revised regulatory interpretation retroactive, effectively making new law through its adjudicatory proceeding. In *SEC v. Chenery Corp.,* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court held that the decision to make new law through rulemaking or adjudication "is one that lies primarily in the informed discretion of the administrative agency." *Id.* at 203, 67 S.Ct. at 1580. The question remains, however, whether to apply the ruling prospectively or retroactively. While at one time any rule properly established through adju-

dication would be applied with full retroactive effect, *see Linkletter v. Walker,* 381 U.S. 618, 622–24, 85 S.Ct. 1731, 1733–35, 14 L.Ed.2d 601 (1965), "the accepted rule today is that in appropriate cases the Court may in the interest of justice make the rule prospective." *Id.* at 628, 85 S.Ct. at 1737.

In *Chenery,* the United States Supreme Court established a balancing test used to ascertain whether adjudicatory rulemaking should be applied prospectively only. 332 U.S. at 203, 67 S.Ct. at 1580. The court in *Retail, Wholesale & Department Store Union v. NLRB,* 466 F.2d 380 (D.C.Cir. 1972), elucidated the balance suggested in *Chenery* by focusing on the following factors:

(1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

*Id.* at 390.

Applying the five-factor balancing test articulated in *Retail, Wholesale,* we find that the statutory interest in using the new method of calculating the purchase/sale ratio is outweighed by the unfairness of upsetting Hobbs' reasonable reliance on a method of calculating the purchase/sale ratio that had been tacitly approved in the past two PGAC applications.

The method of calculating the purchase/sale ratio has been tacitly approved for the past four years in Hobbs' PGAC applications, so it is not a question of first impression. This factor weighs against the Commission, as does the second factor, because the new rule represents an abrupt departure from the Commission's previous practice of approving Hobbs' PGAC applications that used the amount of gas pur-

chased in the numerator of the purchase/sale ratio.

As to the third factor, extent of reliance, Hobbs did rely on its method of calculation, which was reasonable under its interpretation of the regulations. In *Daughters of Miriam Center for the Aged v. Mathews*, 590 F.2d 1250, 1262 (3d Cir.1978), the court found that a central question in the *Retail, Wholesale* analysis is how the party's conduct would have differed had the rule been applied from the start. As it was, Hobbs relied upon the method of calculation used in the approved PGAC application, which allowed Hobbs to sustain an income such that it had no need to apply for modification of the base rates established in its last rate case in 1982. Had the Commission given notice to Hobbs that the proper method of calculating the purchase/sale ratio was to use gas delivered in the numerator of the ratio, instead of the amount purchased, Hobbs could have filed a rate case to adjust its projected income accordingly.

In *Southwestern Public Service Co. v. FERC*, 842 F.2d 1204, 1208 (10th Cir.1988), the court noted that a good-faith reliance on a prior policy was an important factor in applying the *Retail, Wholesale* balancing test. In *Southwestern*, the Federal Energy Regulatory Commission had approved prior rate filings by Southwestern that included, since 1971, a flow-through-to-earnings method of accounting in calculating its investment tax credits. In a 1987 order entered pursuant to a rate increase request, the Commission required that all investment tax credits since 1971 be accounted for under the normalization method of investment tax credit treatment. *Southwestern*, 842 F.2d at 1205. The court found Southwestern's reliance upon approvals of rate applications containing accounting practices for the investment tax credits reasonable. *Id.* at 1209. Similarly, Hobbs has relied on approvals of PGAC's containing computations of purchase/sale ratios using the cost of purchased gas in the numerator of the ratio. If action by the agency leads to reasonable reliance on a certain interpretation of the rules, retro-active application of a change in policy is arbitrary and capricious.

The degree of the burden placed upon Hobbs by the new interpretation of "purchase/sale ratio" is substantial. The effect is to require Hobbs to write off forty percent of its net equity and experience no cash flow in the first year of refunds. Hobbs maintains that the refund will require it "to seek the protection of bankruptcy laws, and would further render it unable to meet its debts as they came due (the indicator of insolvency) or attract financing."

Finally, we must consider the statutory interest in applying the new interpretation despite Hobbs' reliance on the old standard. It appears that the purpose the Commission is attempting to effectuate through its requirement for PGAC reports is to "assure the existence of adequate regulatory control over a utility's operations under the PGAC." NMPSC Rule 640.1(b). Rule 640.14 allows the Commission to order refunds when the Commission determines that "the utility's collection of such amounts is contrary to the provisions of Rule 640 or otherwise is unjust and unreasonable." Thus, the intent of the refund is to allow for the reparation of money collected in contravention of an approved PGAC. Hobbs, however, did not collect more than was permitted under its approved PGAC. The refund is based solely on a new interpretation of the proper method for calculating the purchase/sale ratio. The amount collected from Hobbs' customers was not unreasonable, because it was based on a PGAC application approved by the Commission, nor was it unjust, considering that Hobbs' residential rates (including its PGAC) are among the lowest in the country.

The statutory interest in applying the new method of determining the purchase/sale ratio retroactively does not strike us as outweighing Hobbs' reliance interest on the method of calculation used in the approved PGAC's. Considering that Hobbs could have applied for a rate increase had it been notified in a timely manner of the proper method of calculating the

purchase/sale ratio, that the financial burden of reparations might bankrupt the utility, and that Hobbs' rates are already among the lowest in the country, it seems fundamentally unfair to apply the new interpretation to Hobbs retroactively.

■ We hold that a regulatory body cannot, without prior notice, abruptly depart from past practice on which the regulatee has relied and impose a retroactive refund requirement upon the regulatee. Therefore, the ordered refund for the period September 1, 1988, to August 31, 1990, is unreasonable and unlawful. The requirement in the order in Case No. 2369, decretal paragraph G[2], that Hobbs refund "overcollections" for the period September 1, 1990, to August 1, 1991, is also unreasonable and unlawful. The Commission did not give notice of its new requirements respecting Hobbs' PGAC until April 1, 1992, when it issued the Case No. 2369 order. From that point on, Hobbs was on notice of the new regulatory treatment that would be applied to its PGAC, and at its own risk it continued using its PGAC in the way it had done before. Once notice was given, nothing prevented the Commission from adopting a new regulatory practice and applying it prospectively; if Hobbs chose not to comply, it did so at its own peril. Therefore, decretal paragraph D of the order was a reasonable and proper exercise of the Commission's regulatory authority. That paragraph directed that: "By no later than May 1, 1992, Hobbs shall cease charging its ratepayers through its PGAC for free gas and implement the correct methodology determined in this case." Thus, on remand, the Commission is free to enforce the requirement that Hobbs implement the new methodology as of May 1, 1992, and may order appropriate refunds for any overcollection it finds to have occurred after that date, adjusted as may be

appropriate for the passage of time, provided it either omits the requirement of using a purchase/sale ratio of 1.042067 or establishes an evidentiary basis for doing so.

■ This brings us to our next issue concerning Case No. 2454. The order in that case should be vacated. The order directs Hobbs to utilize the Commission's methodology in determining its PGAC as the means of complying with decretal paragraph D. Although we hold that the Commission was entitled to enforce the portion of its order in Case No. 2369 not stayed by this Court,[3] the method it chose to do so lacked an evidentiary foundation and was accordingly unreasonable and unlawful. The Commission acted arbitrarily when, in calculating the amount of gas cost which cannot be passed on in its PGAC, it mandated a purchase/sale ratio of 1.042067, which imputes a 4.2 percent line loss.

In computing the amount of gas costs recovered through the utility's basic rates, Hobbs could no longer use a purchase/sale ratio in which the numerator was the units of gas purchased from its suppliers and the denominator was the units of gas sold to its customers. When Hobbs was receiving unbilled gas, the purchase/sale ratio was less than one. The final order required that Hobbs not merely apply a purchase/sale ratio of one but assume line losses in the reporting period equal to more than 4 percent of sales to customers. While the Commission acknowledged that a utility is entitled to retain savings from reduction of line losses between rate cases, the forced imposition of a purchase/sale ratio in excess of one assumed that Hobbs had experienced line losses in the reporting period of 4.2 percent in excess of the gas it sold to its customers. There is no evidence in the record to support this assumption. The Commission incorrectly assumed that line losses which Hobbs experienced in

---

**2.** Decretal paragraph G in the order in Case No. 2369 provides that: "Hobbs shall refund the amount of any overcollection which is later determined by the Commission to have taken place during the 1991 Reconciliation period (September 1, 1990 to August 31, 1991) through its corrected PGAC over the twelve-month period following the Commission's determination."

**3.** By order dated July 8, 1992, we refused to stay the order in Case No. 2369 insofar as that order required Hobbs to "cease implementing its Purchased Gas Adjustment Clause from May 1, 1992, ... pending approval of a new PGAC."

1981 or 1982 accurately reflect its line losses in the 1988–90 reporting period. Uncontroverted testimony concerning Hobbs' actual experience was that it had no line losses during the reporting period. Thus, there was no factual basis for assuming that Hobbs' gas acquisitions exceeded its sales to customers by 4.2 percent. "The standard of review for appeals from administrative agencies is whether there is substantial evidence in the record as a whole to support the agency decision." *Gonzales v. Pub. Serv. Comm'n (In re Elec. Serv. in San Miguel County)*, 102 N.M. 529, 531, 697 P.2d 948, 950 (1985). Because the Commission arbitrarily required use of a purchase/sale ratio of 1.042067 without any evidentiary basis for the use of that figure, we hold that the order in Case No. 2454 is unreasonable and unlawful.

In view of the foregoing, we annul and vacate the Commission's orders in Case No. 2369 and in Case No. 2454. Because we vacate the order in Case No. 2454, Hobbs' contention that it is free to elect not to use a PGAC at all is moot. Moreover, Hobbs' contention that it could not be ordered to file a rate case is also moot. An order on this rate case (Case No. 2462) was issued April 30, 1993, and Hobbs is appealing.

IT IS SO ORDERED.

BACA, MONTGOMERY and FROST, JJ., concur.

RANSOM, C.J., dissents.

RANSOM, Chief Justice (dissenting).

I respectfully dissent. The Commission has designed the adjustment clause under New Mexico Public Service Commission Rule 640 to allow a natural gas utility to adjust its pricing in response to fluctuations in natural gas prices without going through the expense and delay of a rate case. Under Rule 640.14, when ordered at the discretion of the Commission, the utility must make refunds of charges collected contrary to Rule 640 (or if the collection is otherwise unjust and unreasonable). We should review the Commission's exercise of discretion to determine whether it acted arbitrarily without support of substantial

evidence. I do not agree with the way the majority opinion applies this appropriate standard of review to the facts of this case.

At all times relevant to this case, the Commission's announced purpose for Rule 640 has been to assure that only a utility's actual legitimate gas purchase costs are recovered through the adjustment clause. *Re Standard Purchased Gas Adjustment*, 40 PUR4th 619, 629 (NMPSC 1980). It is undisputed that Hobbs Gas never affirmatively disclosed to the Commission that it was receiving delivery of substantial amounts of free gas which it was selling to its ratepayers. The evidence adduced before the Commission was that the Commission's staff was unaware of the purchase costs of the gas sold. Nevertheless, my colleagues on this Court believe that the inclusion of negative purchase/sales ratios in reports to the Commission imputes to the Commission as a matter of law knowledge that Hobbs Gas was receiving substantial amounts of free gas, and that the free gas had been sold to its customers for the same price as gas for which it had paid.

From the imputation of knowledge of free gas, the majority opinion attributes to the Commission an "established practice" of calculating purchase/sales ratios without adjusting for free gas. From this premise, the majority then charges the Commission with *"changing this interpretation so as to base the purchase/sale ratio on gas delivered."* (Emphasis added.) This, in turn, gives rise to application of the balancing test suggested in *Chenery* to ascertain whether adjudicatory rule making should be applied retroactively. I endorse the use of a "retroactive rule making" analysis in favor of an equitable estoppel analysis. I question only the premise for its application and the discussion of detrimental reliance and imposition of burden under the third and fourth prongs of the balancing test as elucidated in *Retail, Wholesale & Department Store Union v. NLRB*, 466 F.2d at 390.

I am impressed with the fact that, because it never adjusted its charges to ac-

count for the acquisition of the free gas,[1] the calculations made by Hobbs Gas, resulting in the anomalous ratios, were incorrect and contrary to the adjustment clause rule. As I read the rule, the Commission is correct in its assertion that the "purchase" side of the purchase/sales ratio always was supposed to include all gas delivered to the utility. The purchase/sales ratio is defined in Rule 640.21(e) under the heading of "Methodology." The number to be used for the "purchase" side of the ratio is the same number that is used as the divisor in the calculation of the average cost of gas. The divisor in the calculation of the average cost of gas is "the number of units used for computing the cost of gas." Rule 640.21(b). The "cost of gas" factor is to be determined, in part, by applying the appropriate rates and charges to the "quantities of gas *delivered* by each major supplier." Rule 640.21(d) (emphasis added). "Appropriate rates" means the price paid for a particular unit of gas that was delivered— presumably the contract price on the date of delivery. The number of *delivered* units is then used as the divisor in the average cost of gas calculation and in the purchase/sales ratio. Had the unmetered gas been included as delivered gas in the "cost of gas" calculation, the units of free gas would have resulted in a lower "average cost of gas" and would have been carried through to the purchase/sales ratio, giving a ratio of more than one.

Because Hobbs Gas calculated its purchase/sales ratio based on an error in its cost of gas, it had an obligation under Rule 640.14 to make refunds. This error was not caught by the Commission until the third review of the adjustment clause practices of Hobbs Gas. The hearing officer found that since it was not apparent on its face, the Commission was justified in failing to notice the effect of a purchase/sales ratio of less than one in its previous reviews. This finding was, in part, based on the fact that Hobbs Gas was the only utility that used this particular formula in reporting to the Commission. Evidence supports the finding that the Commission actually was not aware of the effect of the negative ratio, even though the ratio tacitly indicated premises from which the Commission staff could have deduced that Hobbs Gas was getting some gas for free.

The fact that the anomalous purchase/sales ratio was not caught the first two times it was reported did not establish a "practice" by the Commission. Rather, the Commission simply committed administrative oversight. Catching the error in the third review was not a change of the rule or of the Commission's position. Because there was no change, the majority's retroactive-rule-making analysis is unnecessary. Even if the analysis should be done, I would not agree that Hobbs Gas has shown that it detrimentally relied on the "former rule," or that the question of the degree of the burden in making the refund is a proper question for this Court. I am inclined to agree with the Commission that, "Quite simply, Hobbs knew that it was charging for free gas and the Commission did not."[2]

Finally, I fail to see how overcharging its customers could be construed as an action detrimental to Hobbs Gas other than the fact that when it was found out, Hobbs Gas had to refund money. There was no change by Hobbs Gas in reliance on the Commission's previous failures to recognize the effect of the purchase/sales ratio used; there was merely a continuation of the same behavior. Regardless of whether

---

1. There was evidence that in 1981 Hobbs Gas had line losses of 4.2% of its gas, and that it used that figure in subsequent year calculations. There was no evidence that this figure was no longer accurate for line losses. The hearing examiner properly justified its use because there was no better figure available. Hobbs Gas reasonably could have been charged with knowledge of the amount of total (metered and unmetered) deliveries through use of the established line loss figure of 4.2%, i.e., sales × 1.042.

2. As the majority opinion acknowledges, one purpose of the adjustment clause is for ratepayers automatically to receive the benefit of reductions in fuel costs. Regardless of the failure of Hobbs Gas to use the proper formula for calculating the purchase/sales ratio, it violated Rule 640 by not giving its ratepayers an adjustment for the free gas.

Hobbs Gas was "profiteering" from its use of the adjustment clause, I can see no detrimental reliance that would prevent the order of a refund of charges collected contrary to Rule 640. I find it purely speculative that, as argued in the majority opinion, "Had the Commission given notice to Hobbs that the proper method of calculating the purchase/sale ratio was to use gas delivered in the numerator of the ratio, instead of the amount purchased, Hobbs could have filed a rate case to adjust its projected income accordingly."

While Hobbs Gas may "maintain" that the refund would require it "to seek the protection of bankruptcy laws, and would further render it unable to meet its debts ... or attract financing," I find in the record no irrefuted evidence establishing the truth of those dire predictions. I would leave it to the Commission to decide the degree of the burden which a retroactive order imposes on Hobbs Gas. In essence, Hobbs Gas has admitted it could pay the refund over a six-year period; and the Commission believes the utility can borrow the necessary funds now and pay the loan back over a six-year period or longer. The question for the Court should be whether this was a factual question supported below by substantial evidence.

Although I agree with the recitation of the law in the majority opinion, I would dissent from the application of that law to the facts of this case and defer to the decision of the Commission, which I find to be supported by substantial evidence.