3 F.3d 1526
 303 U.S.App.D.C. 242, 147 P.U.R.4th 427
 CAPITAL NETWORK SYSTEM, INC., Petitioner,
NYCOM Information Services, Inc., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
US WEST Communications, Inc., et al., Intervenors.
 Nos. 91-1280, 91-1291.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 28, 1993.
Decided Sept. 17, 1993.
 
 Petitions for Review of an Order of the Federal Communications Commission.
 Mitchell F. Brecher, Washington, DC, argued the cause for petitioners. With him on the joint brief were Kathleen J. Masterton, Washington, DC, and Amy S. Gross, Stamford, CT.
 Laurel R. Bergold, Counsel, Federal Communications Com'n ("FCC"), Washington, DC, argued the cause for respondents. With her on the brief were Renee Licht, Acting Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and John E. Ingle, Deputy Associate Gen. Counsel, FCC, and Robert B. Nicholson and Robert J. Wiggers, Attorneys, U.S. Dept. of Justice, Washington, DC. Robert L. Pettit, Washington, DC, also entered an appearance for respondents.
 
 
 1
 Robert B. McKenna, Denver, CO, entered an appearance for intervenor US WEST Communications, Inc.
 
 
 2
 Andrew D. Lipman, Washington, DC, entered an appearance for intervenor Zero Plus Dialing, Inc.
 
 
 3
 [303 U.S.App.D.C. 243] Donald W. Boecke, Washington, DC, entered an appearance for intervenor NYNEX Telephone Cos.
 
 
 4
 Martin T. McCue, Washington, DC, entered an appearance for intervenor United States Telephone Ass'n.
 
 
 5
 John W. Bogy, James P. Tuthill, and Stanley J. Moore, San Francisco, CA, entered appearances for intervenors Pacific Bell and Nevada Bell.
 
 
 6
 Alfred W. Whittaker, Washington, DC, and Floyd S. Keene, Hoffman Estates, IL, entered appearances for intervenors Ameritech Operating Cos.-Illinois Bell Telephone Co., et al.
 
 
 7
 Albert H. Kramer and Robert F. Aldrich, Washington, DC, entered appearances for intervenor American Public Communications Council of the North American Telecommunications Ass'n.
 
 
 8
 John Paul Walters, Edmond, OK, and Richard C. Hartgrove, St. Louis, MO, entered appearances for intervenor Southwestern Bell Telephone Co.
 
 
 9
 Theodore D. Frank and Vonya B. McCann, Washington, DC, entered appearances for intervenor Central Telephone Co. in No. 91-1291.
 
 
 10
 Before EDWARDS, BUCKLEY, and SENTELLE, Circuit Judges.
 
 
 11
 Opinion for the court filed by Circuit Judge BUCKLEY.
 
 BUCKLEY, Circuit Judge:
 
 12
 Capital Network System, Inc. and NYCOM Information Services, Inc. are providers of interexchange telephone service. They petition for review of a ruling of the Federal Communications Commission denying a request for the initiation of a rulemaking or other measures that would reinstate the regulation of billing and collection services provided by local exchange telephone companies to interexchange companies for tolls arising from operator-assisted long distance calls. Because petitioners have failed to adduce sufficient evidence of the need for regulation, we deny their petitions.
 
 I. BACKGROUND
 A. Applicable Law
 
 13
 The Communications Act, 47 U.S.C. Secs. 151-613 (1988), authorizes the Federal Communications Commission ("FCC" or "Commission") to regulate interstate and foreign telephone and radio communication. 47 U.S.C. Secs. 151, 152(a). Under Title II of the Act, 47 U.S.C. Secs. 201-224, the Commission is given explicit authority to regulate rates charged for "communication service" by interstate and international communications common carriers. See 47 U.S.C. Sec. 201(a). In addition, Title I of the Act, 47 U.S.C. Secs. 151-58, grants the Commission "ancillary" authority to regulate activities of communications carriers that are not subject to regulation under Title II. See 47 U.S.C. Sec. 152(a) ("this chapter shall apply to all interstate and foreign communication by wire or radio...."); 47 U.S.C. Sec. 153(a) (defining "communication by wire" as "the transmission of writing, signs, signals, pictures, and sounds of all kinds ..., including all instrumentalities, facilities, apparatus, and services ... incidental to such transmission ") (emphasis added); 47 U.S.C. Sec. 154(i) (empowering the Commission to "perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions"); see also United States v. Southwestern Cable Co., 392 U.S. 157, 178, 88 S.Ct. 1994, 2005, 20 L.Ed.2d 1001 (1968) (in regulating broadcasting, section 152(a) authorizes the Commission to take actions that are "reasonably ancillary to the effective performance of [its] various responsibilities").
 
 B. Factual and Procedural History
 
 14
 This case is one of many arising from the breakup of the American Telephone and Telegraph Company. Before the breakup, the Bell Companies (the local telephone exchange companies then affiliated with AT & T) performed the billing and collection task in connection with AT & T's long distance services. As part of the "Modification of Final Judgment" ("MFJ"), the antitrust consent decree that required AT & T to divest itself of the Bell companies, these newly divested companies were permitted to continue [303 U.S.App.D.C. 244] these services but were required to offer them on the same terms to all long distance service providers. See United States v. American Tel. & Tel. Co., 552 F.Supp. 131, 234 (D.D.C.1982), aff'd sub nom. Maryland v. United States, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). Shortly after the MFJ took effect, similar terms were imposed by another settlement decree on the local telephone exchange companies controlled by GTE Corporation. See United States v. GTE Corp., 603 F.Supp. 730, 743 & n. 55 (D.D.C.1984). Together, the Bell and GTE companies provide about 90 percent of all local telephone exchange service in the United States. See id. at 733-34.
 
 
 15
 In the immediate aftermath of the AT & T breakup, the FCC brought billing and collection services under regulation, requiring compliance with approved rate schedules and prohibiting discrimination in the provision of such services. See MTS and WATS Market Structure, 97 F.C.C.2d 682, 741-42 (1983), aff'd in part and remanded in part on other grounds, National Ass'n of Regulatory Util. Comm'rs v. FCC, 737 F.2d 1095 (D.C.Cir.1984). The FCC asserted authority to impose these requirements under Title II of the Communications Act. See id. at 741.
 
 
 16
 In January 1986, the Commission ordered the deregulation of billing and collection services. Detariffing of Billing and Collection Services, 102 F.C.C.2d 1150 (1986) ("Detariffing Order "). That order held that billing and collection in connection with telephone service was not a "communication service," and that even if it were deemed a communication service, it was "doubtful" that it could qualify as a "common carrier service," id. at 1168-69; hence, such services were not, as the Commission had previously thought, subject to regulation under Title II of the Act. Although the Commission found that it could perpetuate its regulatory regime on the authority of its "ancillary jurisdiction" under Title I, it declined to do so. See id. at 1169-71. Having established that "there is sufficient competition to allow market forces to respond to excessive rates or unreasonable billing," the FCC concluded that "no statutory purpose would be served by continuing to regulate billing and collection service." Id. at 1170.
 
 
 17
 In promulgating the Detariffing Order, the Commission's focus was almost exclusively on the market for "subscriber," or "1+," long-distance service, for which tolls are charged to the account of the telephone that originates the call. When the Detariffing Order was issued, competition in the other segment of the long-distance market, that for "operator-assisted," or "0+," service was still in its infancy. Operator-assisted calling, as the term is used here, includes all calls for which tolls are not automatically charged to the owner of the line originating the call, whether or not an actual operator assists in the call's completion. Credit card, collect, and bill-to-third party calls are all examples of operator-assisted services.
 
 
 18
 A surge of competition in the operator-assisted segment of the market followed in the wake of the AT & T breakup, and, amidst this surge, several interexchange carriers ("IXCs") became convinced that certain local exchange carriers ("LECs") were subjecting them to exorbitant rates and discrimination in billing and collecting for operator-assisted calls. In particular, these IXCs were concerned with the practices of the "independent" LECs who, because they had not been affiliated with AT & T or GTE, were not bound by the nondiscrimination strictures of the two consent decrees. The independents number about 1,400, and they control approximately 10 percent of the local exchange market.
 
 
 19
 Many independent LECs have continued to provide billing and collection services to AT & T while refusing to provide them to other interexchange carriers. Thus, if a person walks into a telephone booth connected to AT & T and places a collect call to a number assigned by an independent LEC, AT & T will complete the call, the independent LEC will bill the call on its customer's regular bill, and AT & T will receive reimbursement, less a collection fee, from the LEC. But if that same person walks into a booth connected, say, to petitioner Capital Network Systems ("CNS") and seeks to place the same collect call, in many instances the independent LEC will refuse to bill and [303 U.S.App.D.C. 245] collect for the call as it would have for AT & T. Under such circumstances, CNS must either transfer the call to AT & T for completion or complete the call itself and then try to bill the party who accepted it.
 
 
 20
 On June 1, 1989, CNS and the Competitive Telecommunications Association ("CompTel"), an industry group, filed a petition with the FCC asking it to consider three actions. Petition to Mandate Availability of Essential Billing and Collection Services and Access to Call Validation Data on a Just and Reasonable Basis or in the Alternative Petition for Rulemaking dated June 1, 1989 ("CNS/CompTel petition"). First, they asked the Commission to "adopt a policy" requiring LECs to offer billing and collection services on terms that are "just and reasonable and [do not] unreasonably discriminate" against or in favor of any IXC. Id. at 1. Second, they asked it to "adopt a policy statement requiring all LECs to make available to IXCs the data necessary to validate calls charged to calling cards, third party-billed telephone numbers, and collect calls." Id. at 2. (Such validation data allows an IXC to verify, for example, that the credit card account number given by a caller is valid or that the telephone number given in a third party-billed call is capable of being charged.) Third, "[t]o the degree that the relief requested herein requires that the Commission promulgate rules," the petition asked as an alternative that the Commission
 
 
 21
 commence forthwith a rulemaking proceeding proposing rules mandating LEC provision of billing and collection services and access to validation data on a just and reasonable basis to providers of operator-assisted services.
 
 
 22
 Id.
 
 
 23
 In response to the CNS/CompTel petition, the FCC issued a notice of proposed rulemaking stating that it would not re-regulate the provision of billing and collection services, but it would make it possible for interexchange carriers to bill for operator-assisted services without the aid of the LECs. See Policies and Rules Concerning Local Exchange Carrier Validation and Billing Information for Joint Use Calling Cards, 6 F.C.C.R. 3506 (1991) ("Notice "). Thus, while it denied the particular CNS/CompTel request, it did initiate rulemaking proceedings aimed at forcing LECs to share with IXCs both validation data and customer billing name and address ("BNA") data. Id. at 3508. According to the Commission, disclosure of "the full component of validation data," along with customer BNA, would "enable IXCs to independently seek reimbursement" for their services. Id. Contending that the FCC's actions did not go far enough, CNS and NYCOM Information Services, Inc. filed these petitions to challenge that part of the Notice which denied the CNS/CompTel requests.
 
 
 24
 Subsequent to the filing of these petitions, and while this case was pending, the Commission took the first step down the regulatory road it had mapped out in the Notice. See Policies and Rules Concerning Local Exchange Carrier Validation and Billing Information for Joint Use Calling Cards, 7 F.C.C.R. 3528 (1992) ("Validation Order "). Specifically, the FCC agreed to issue rules requiring LECs to share validation data, see id. at 3531-33, and prohibiting them from discriminating among IXCs in entering into joint calling-card arrangements. Id. at 3535. It took no action, however, on its proposal to require the disclosure of customer BNA data, asking instead for further comment. Disclosure of this data, the Commission said, raised "privacy concerns and questions of compliance with state disclosure laws." Id. at 3539.
 
 
 25
 Petitioners' principal claim here is that the FCC acted arbitrarily and capriciously in declining to institute the rule-making proceedings requested by the CNS/CompTel petition. We discuss this claim at length below. In addition, they present several arguments that do not warrant discussion. First, they have tried to buttress their principal claim with statements by members of Congress during the consideration of the Telephone Operator Consumer Services Improvement Act of 1990, 47 U.S.C. Sec. 226 (Supp.1991), a law that we are not called upon to apply here. Needless to say, such statements have no bearing on our disposition of this case. Second, they claim that the FCC ruling contested here is invalid because it contradicts a "precedent" that had not yet issued at the [303 U.S.App.D.C. 246] time of that ruling. We have noted, however, that "the Commission [can] hardly be faulted for ignoring 'precedents' that did not precede." Northhampton Media Assocs. v. FCC, 941 F.2d 1214, 1217 (D.C.Cir.1991).
 
 II. DISCUSSION
 A. Finality
 
 26
 The United States joins the FCC in asking us to dismiss this appeal on the ground that the order on review is not final. Respondents argue that there has been no "terminal, complete resolution" of the case before the Commission because rulemaking proceedings are ongoing and, more particularly, because the FCC has yet to determine whether disclosure of customers' BNA information will be required. We disagree.
 
 
 27
 As a general rule, a court may only review FCC orders that are final. See 28 U.S.C. Sec. 2342(1) (granting courts of appeals jurisdiction to review "final orders of the Federal Communications Commission") (emphasis added); see also 5 U.S.C. Sec. 704 (making subject to judicial review "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court") (emphasis added). For purposes of review, an agency action is final if it (1) represents "a terminal, complete resolution of the case before the agency," Intercity Transportation Co. v. United States, 737 F.2d 103, 106 (D.C.Cir.1984) (quotation marks, brackets, and citation omitted); and (2) "determine[s] rights or obligations, or ha[s] some legal consequence," id. We have held that an agency's refusal to institute proceedings "has sufficient legal consequence to meet the second criterion of the finality doctrine." Id. at 107. Hence, the FCC's refusal to embark on the requested rulemaking will be deemed final if, and only if, that refusal terminally and completely resolved "the case before the agency." Id. at 106 (brackets omitted).
 
 
 28
 The CNS/CompTel petition asked the FCC for something quite specific: that the Commission enforce just and reasonable, nondiscriminatory rates on authority of Title I of the Communications Act for all LEC billing and collection service provided in connection with 0+ calls. In response to this request for apples, the FCC promised oranges (access to data enabling IXCs to do their own billing) while giving assurances that what had been promised would be found as satisfactory as what had been sought. But the Commission's alternative offer does nothing to change the character of its response to CNS/CompTel's specific request. There was nothing "tentative, provisional, or contingent" in that response. National Treasury Employees Union v. FLRA, 712 F.2d 669, 671 (D.C.Cir.1983). Therefore, the disposition of that issue was final for purposes of our review.
 
 B. The Merits
 
 29
 Petitioners argue that, in denying the CNS/CompTel petition, the FCC failed to account properly for the practical differences between subscriber service and operator-assisted service, and that it applied to the latter a "detariffing" policy more appropriate to the former. Accordingly, they claim that the FCC acted arbitrarily and capriciously in refusing to initiate a rulemaking to require LECs to provide billing and collection services in connection with operator-assisted calls.
 
 
 30
 We review claims such as petitioners' with great deference to the agency:
 
 
 31
 Review under the arbitrary and capricious tag line ... encompasses a range of levels of deference to the agency, and ... an agency's refusal to institute rulemaking proceedings is at the high end of the range. Such a refusal is to be overturned only in the rarest and most compelling of circumstances, which have primarily involved plain errors of law, suggesting that the agency has been blind to the source of its delegated power.
 
 
 32
 American Horse Protection Ass'n v. Lyng, 812 F.2d 1, 4-5 (D.C.Cir.1987) (citations and internal quotation marks omitted). Indeed, our most recent case to address the issue found that agency refusals to initiate rulemaking proceedings are reviewed "with a deference so broad as to make the process akin to non-reviewability." Cellnet Communication, Inc. v. FCC, 965 F.2d 1106, 1111 (D.C.Cir.1992).
 
 
 33
 [303 U.S.App.D.C. 247] In Cellnet, we reviewed the FCC's denial of a petition to expand a rulemaking proceeding into an inquiry into competitive conditions in the cellular service industry. We treated the petition as "functionally similar to a petition to initiate a rulemaking." Id. We concluded that the petitioner had failed to overcome the extreme deference owed the agency because it had failed to provide evidence "of widespread anticompetitive practices ... so overwhelmingly prevalent that it was irrational for the FCC to withhold the proposed broad inquiry while pursuing the narrower ones now launched." Id. at 1112 (emphasis added). On reviewing the challenges to the FCC on appeal in this case, we find that here, as in Cellnet, petitioners have failed to establish such obvious abuses of monopoly power as to render the Commission's actions irrational.
 
 
 34
 Admittedly, the Commission provided no more than a sparse explanation of its refusal to initiate the requested proceeding. The CNS/CompTel petition requested that "all LECs [be required] to provide billing and collection services on a nondiscriminatory basis, at just and reasonable rates under the authority of Title I" of the Communications Act. Validation Order, 7 F.C.C.R. at 3537 n. 102 (describing the petition denied by the Notice ). In its denial, the FCC said only that the request was "tantamount" to one for the reversal of the deregulation accomplished by the Detariffing Order, and that its representations about the market for operator-assisted services did not "demonstrate that billing and collection services are no longer subject to [the] competitive pressures" that the Detariffing Order had relied on to justify deregulation. Notice, 6 F.C.C.R. at 3509.
 
 
 35
 In effect, the Commission's Notice incorporated by reference the reasons for deregulation given in the Detariffing Order in its announcement of a rulemaking to mandate access to validation data, customer BNA, and LEC joint use calling-card arrangements. According to the FCC, providing "the full component of validation data" plus customer BNA would "enable IXCs to independently seek reimbursement from the cardholder for the services sought by the caller." Id. at 3508. The rationale of the Notice, then, was that the Detariffing Order 's justification for deregulating billing for subscriber service applies equally to the market for operator-assisted service so long as IXCs are able to "independently seek reimbursement" for operator-assisted calls.
 
 
 36
 The Detariffing Order 's defense of deregulation was rooted in considerations of flexibility, innovation, and competition. The FCC ended its discussion there by saying that it wished to afford LECs "flexibility in structuring and pricing" billing and collection services, and that regulation had placed the LECs at a "competitive disadvantage vis-a-vis other [unregulated] billing and collection vendors." Detariffing Order, 102 F.C.C.2d at 1171. Earlier, the Commission had found that "significant competition exists and will continue to develop" in the market for billing and collection services from sources such as "credit card companies, collection agencies, service bureaus and the LECs," in addition to IXCs themselves. Id. at 1170. As evidence of competition, the FCC cited indications of stable or falling prices for LEC billing and collection services, even while a majority of LECs were earning less than the legally allowable rate of return. See id. It also noted that the amount of capital required to provide billing and collection service is modest; hence there are few barriers to entering the market. See id. at 1171. The only "potential bottleneck," the Commission said, was "an I[X]C's or billing vendor's inability to get customer name and address information from the LEC." Id. at 1171 n. 53. The FCC announced its "expectation" that LECs would make such information available, indicating that it might compel such disclosure if they did not. Id.
 
 
 37
 The CNS/CompTel petition challenged this defense of deregulation as it applies to billing and collection for operator-assisted calls. In particular, it cited the practical problems encountered in billing for operator-assisted, as opposed to subscriber, services and the alleged inadequacies in the FCC's strategy for promoting competition. It presented an argument in favor of re-regulation, which proceeded in four steps, as follows.
 
 
 38
 First, LECs are able to bill and collect for operator-assisted service much more efficiently [303 U.S.App.D.C. 248] than anyone else. According to the petition, the cost of purchasing customer BNA from an LEC and rendering bills individually greatly exceeds an LEC's cost of simply adding additional items to a customer's monthly statement. Moreover, this advantage is redoubled by the common willingness of State regulators to permit LECs to disconnect local service when a customer fails to pay the IXC portions of a bill. The result, according to the petition, is both lower administrative costs and a much lower uncollectible rate for LEC-provided billing and collection.
 
 
 39
 Second, alternatives to LEC billing and collection are limited. The petition asserted that although IXCs can and do accept commercial credit cards such as Visa, MasterCard, and American Express in payment for their services, customers are often unable to afford or unwilling to use such cards. In addition, because there is no carrier-subscriber relationship between an IXC and the users of its 0+ services, IXCs are unable to provide them with their own credit cards, as they commonly do in the case of subscribers using their 1+ services.
 
 
 40
 Third, the lack of economical alternatives to LEC billing entails a pair of distressing consequences. According to the petition, LECs are placed in control of an "essential bottleneck service[ ]," thus allowing them "to extract monopoly profits." CNS/CompTel petition at 25-26. What is more, considerable competitive advantages are bestowed upon AT & T by virtue of the willingness of many independent LECs to bill and collect for it, but not for other carriers.
 
 
 41
 The last step in the CNS/CompTel argument holds that the FCC's strategy of requiring LECs to share validation and BNA data will not solve the problem. According to the petition, such data sharing makes non-LEC billing technically feasible, but not economically viable.
 
 
 42
 CNS/CompTel may well prove right in predicting that the alternative being explored in the FCC's alternative rulemaking will not resolve their basic complaint. We acknowledge, as petitioners CNS and NYCOM emphasize on appeal, that AT & T may indeed enjoy certain practical competitive advantages that survive the forces relied on by the FCC to spur competition in the billing and collection marketplace. Nevertheless, if the alternative rulemaking now being pursued by the Commission fails to provide a persuasive solution to the anticompetitive problems petitioners describe, they may challenge the resulting rules at the appropriate time. The CNS/CompTel petition, however, went beyond a simple request for measures to counter AT & T's perceived competitive advantage; and in presenting their case, petitioners have fallen short of the demanding standard described in Cellnet.
 
 
 43
 The FCC's essential position is that (1) access to validation and customer BNA data would permit IXCs to do their own billing; (2) rate regulation for billing and collection connected to 0+ calling would entail many of the same evils cited to support the detariffing of billing and collection for 1+ calling; and (3) given the disadvantages of re-regulation and the ability of IXCs to bill and collect for themselves once they are supplied with the necessary data, it is better to enable IXCs to stand on their own in regard to billing than to inflict on an entire industry a costly, rigid, and unwieldy scheme of regulated rates. This last prong is an inference resting on the two earlier prongs, which are factual premises.
 
 
 44
 Petitioners have chosen to train their fire almost exclusively on the FCC's first premise by disputing the Commission's claim that IXC billing and collection is a realistic alternative, even assuming that validation and customer BNA data are made available. But they have failed to muster the compelling evidence in support of their position that Cellnet requires. Petitioners cite no instances in which IXC-provided billing and collection has been tried and found wanting. They point to no analyses measuring the cost disadvantages of IXC-provided billing and collection service as opposed to LEC-provided services. They adduce no evidence of the monopoly profits allegedly now being earned by LECs. True, acquiring such evidence would be difficult or expensive, at least until BNA information becomes available and IXCs are able to demonstrate firsthand the infeasibility of performing their own billing. [303 U.S.App.D.C. 249] But that is just the point. The FCC may, without fearing our intervention, decline to initiate rulemaking proceedings up until the moment when indisputable evidence of the need for such proceedings has been presented to it. Cf. Cellnet, 965 F.2d at 1112 (petitioner needed to show "evidence of widespread anticompetitive practices ... [that] were so overwhelmingly prevalent that it was irrational for the FCC to withhold the proposed ... inquiry"). Because, on the presentation made here, we cannot find that this point has been reached, we must uphold the FCC's denial of the CNS/CompTel rulemaking request.
 
 
 45
 Having upheld the Commission's refusal to commence the rulemaking, we summarily reject petitioners' final claim that the FCC acted arbitrarily and capriciously in failing to explain why it did not grant their alternative request that it issue what it terms a "declaratory policy statement" requiring LECs to make validation data and billing and collection services available to IXCs. Although it is unclear what is meant by that term, we believe it self-evident that the reasons given by the Commission for denying the requested rulemaking apply with equal force to any alternative means by which petitioners propose that the agency achieve this same end. The FCC made it clear that it understands each of the arguments advanced in the CNS/CompTel petition; it reasonably labeled the alternative requests as seeking, in effect, to re-regulate those services; and it explained why it declined to do so. We see nothing to be gained by requiring the Commission to repeat the obvious.
 
 III. CONCLUSION
 
 46
 Because the Commission's order denying CNS/CompTel's petition for a rulemaking was a final agency action, we have jurisdiction to hear this case. But because petitioners failed to overcome the extraordinary deference owed the FCC when it declines to initiate a rulemaking, the petitions for review are
 
 
 47
 Denied.